Lou Ann **KARLE** and Michael Karle, her husband, Plaintiffs,

v.

**NATIONAL FUEL GAS DISTRIBUTION CORPORATION, Defendant.**

**Civ. A. No. 75–85 Erie.**

United States District Court,
W. D. Pennsylvania.

April 10, 1978.

Will J. Schaaf, Erie, Pa., for plaintiffs.

Irving O. Murphy, Erie, Pa., for defendant.

OPINION

WEBER, Chief Judge.

I. INTRODUCTION

This case presents the issue of the extent of gas company's duty to protect its under-

ground gas mains from corrosion and to inspect its mains periodically to insure that the mains continue to be protected adequately.

On December 18, 1973, natural gas seeped into the drive-in branch of the Marine Bank located on West 38th Street between Liberty and Poplar Streets in Erie, Pennsylvania. The gas exploded and injured the plaintiff, Lou Ann Karle, who worked as a bank teller at the drive-in branch. The gas escaped from a 20″ distribution main running underneath West 38th Street, and seeped into the bank through a telephone conduit. The defendant, the National Fuel Gas Distribution Company (hereinafter, "NFG"), operated and maintained the distribution main since its installation in 1950.

To recover for the personal injuries, the plaintiffs Lou Ann Karle and her husband Michael sued NFG in this court, claiming diversity jurisdiction. The Karles contend that NFG failed to protect adequately its 38th Street main from corrosion and failed to inspect the main regularly to insure that the main was not leaking. In addition, the Karles assert that NFG is liable under theories of strict liability and negligence *per se* as the result of the gas company's violation of federal regulations on corrosion control.

The deteriorating effect of underground electrical currents on underground metal pipe, called corrosion, is at the heart of this lawsuit. Corrosion occurs when an underground electrical current leaves the pipe and re-enters the surrounding soil. The pipe corrodes at the point of the current's departure. The more susceptible a particular soil is to the passage of electrical current, or the lower its "resistivity",[1] the more likely it is that pipes buried in that soil will corrode.

To prevent the corrosion of underground pipes, utility companies commonly use a procedure known as "cathodic protection." Cathodic protection seeks to prevent electrical currents from passing from the pipe to the soil by directing a stronger current onto the surface of the pipe which, essentially, overpowers and negates any current which would otherwise leave the pipe and corrode the pipe at that point.

Utility companies generally select one of two methods of cathodic protection to prevent corrosion—impressed current and galvanic. The impressed current method achieves cathodic protection by attaching an external source of direct current directly to the pipeline. The galvanic method involves attaching to the pipeline anodes made of zinc or magnesium—metals more electrically active than the metal of the pipeline. The interaction of dissimilar metals in the medium of an electrically resistant soil creates a flow of electricity from the anode to the pipeline. As a result of this interaction, the metal of the anode corrodes. These anodes are sometimes called "sacrificial anodes" because the metal of the anode corrodes instead of the metal of the pipeline. The electrical flow from the anode to the pipeline, like the flow from the battery to the pipeline in the impressed current method, overpowers any electrical current which would otherwise leave the pipe and corrode it in the vicinity of the anode. The effectiveness of the anode in reducing corrosion is greatest in the immediate area of the anode, and diminishes progressively further away from the anode. Accordingly, to protect a pipeline from corrosion over a distance of hundreds of feet, many anodes are generally required.

1. Resistivity is determined by the water content and mineral composition of the soil. For example, since water generally conducts electricity better than most soils, wet soil is generally more corrosive than dry soil because it has a lower resistivity. Resistivity is measured in ohm-centimeters. Soil whose resistivity is between 0 and 1000 ohms-centimeters (ohms-cm.) is considered extremely corrosive, between 1000 and 5000 ohms-cm. is considered very corrosive, between 5000 and 10,000 ohms-cm. is considered moderately corrosive, and soil whose resistivity exceeds 10,000 ohms-cm. is considered mildly corrosive. The plaintiffs' expert witness tested the soil in the vicinity of the Marine Bank and found its resistivity to be about 6000 ohms-cm. which indicates that the resistivity of the soil was in the very corrosive to moderately corrosive range.

Electrical potential measures the facility with which electricity can leave a pipeline at various points, and it is possible to measure the likelihood that a particular section of pipe will corrode by calculating the electrical potential of the pipeline at various points. Electrical potential is measured in millivolts (mv.) by conducting pipe to soil potential surveys.[2] The same pipeline may have different potentials if the soil is different at one point than at another. Generally, the higher a pipeline's electrical potential, the more difficult it is for electricity to leave the pipeline and hence, the less likely it is that the pipeline will corrode. Most authorities agree that a pipe to soil potential of 850 mv. indicates relatively little likelihood of corrosion.[3] Because the installation of cathodic protection should increase a pipeline's potential, one may determine whether a pipeline is adequately protected by comparing pipe to soil measurements taken before and after the installation of cathodic protection.

## II. FINDINGS OF FACT

Lou Ann and Michael Karle are residents of Pennsylvania, and NFG is incorporated in New York. The Court has jurisdiction over this lawsuit, in which the amount in controversy exceeds $10,000, on the grounds of diversity of citizenship, 28 U.S.C. § 1332(a) [1940]. Pennsylvania law applies.

NFG installed the 20″ pipeline which runs underneath West 38th Street in the City of Erie, Pennsylvania in 1950. The pipeline is called a distribution main as opposed to a service main. It carries gas at a pressure of 40 p. s. i. This pressure is greatly reduced when the gas passes through service mains for delivery to the individual customer. The steel wall of the tube is .375″ in thickness, and is bare of any corrosion retardant coating. The pipeline

was not cathodically protected until November 11, 1963, when NFG installed magnesium anodes at various intervals on the pipeline. The anodes installed in 1963 were generally 250′ apart. NFG installed two anodes in 1963 between Liberty and Poplar Streets, in the vicinity of the Marine Bank branch, at points 50′ and 300′ east of Liberty Street. According to pipe to soil potential surveys conducted before the anodes were installed, the potentials of the 20″ pipeline in the area of the Marine Bank branch ranged from 600 mv. to 650 mv. NFG did not conduct a pipe to soil potential survey after the anodes were installed in 1963, and the next pipe to soil survey was not conducted until September 1970.

On January 13, 1970, the pipeline leaked at a point 247′ east of the centerline of Liberty Street, and a quantity of gas escaped into the Marine Bank drive-in branch office at 38th and Liberty Streets, which was the same structure eventually destroyed by the explosion of December 13, 1973. NFG repaired the 1970 leak with a clamp and workmen excavated approximately 6–12′ for visual inspection and conducted leak survey tests. NFG installed one or two more anodes on the pipeline at the point of the 1970 leak. A pipe to soil potential survey, done for NFG in September 1970, indicated that the pipe to soil potential of the 20″ pipeline between Liberty and Poplar Streets was generally greater than 900 mv.

On December 18, 1973, the pipeline leaked again, this time at a point 230′ east of the centerline of Liberty Street. The gas escaped through a telephone conduit into the Marine Bank drive-in branch. The gas exploded, demolished the drive-in branch, and injured Lou Ann Karle seriously. The cause of the leak was active galvanic corrosion. Immediately following the

---

**2.** A pipe to soil potential survey measures potential in negative millivolts (mv.). The negative signs which appear normally before potential readings will be omitted.

**3.** The plaintiffs' expert witness testified that two criteria indicate whether a system of cathodic protection is providing adequate protection against corrosion: 1) a pipe to soil potential of at least 850 mv.; and 2) a change of at least 300 mv. from the pipe to soil measurements taken before the installation of cathodic protection to those taken after. We mention these criteria because they are used by the Department of Transportation, see 49 C.F.R. § 192, Appendix D.

explosion, NFG workmen excavated the pipeline in the area of the 1973 leak and removed objects which may have been anodes. On December 19, 1973, a pipe to soil potential survey disclosed potentials of 650 mv. and 680 mv. in the area of the rubble of the drive-in branch. In addition, from 9:45 a. m. on December 18, 1973—the time of the explosion—to 11 a. m. on December 19, 1973, NFG employees located gas escaping from the ground in explosive concentrations at several points around the drive-in branch.

From September 1970 to December 19, 1973, no pipe to soil potentials were conducted in the vicinity of Poplar and Liberty Streets on the 38th Street pipeline. NFG conducted other tests periodically to detect the presence of escaped gas.

On April 3, 1976, plaintiffs' expert witness conducted soil resistivity tests in the area of Liberty, Poplar, and 38th Streets, and found the average soil resistivity was about 6000 ohms-centimeter. The plaintiffs' expert witness, Fitzgerald, testified that these readings indicate that the soil in the drive-in branch area was moderately to very corrosive and that these readings reasonably indicate the soil condition at least since 1963.

Other facts established will be discussed in the context of the discussion of the legal principles to which they apply.

## III. LIABILITY

### A. COMMON LAW NEGLIGENCE.

■ To establish liability under common law negligence, a plaintiff must prove that the defendant breached its duty of care to the plaintiff and that this breach of care was the proximate cause of the plaintiff's injuries. The extent of one's duty to another is variable and depends upon the probability and magnitude of harm and the cost of inconvenience of acting to prevent the harm from occurring, *United States v. Carroll Towing Co.*, 159 F.2d 169, 173 [2d Cir. 1947].

■ In delimiting the duty of care of gas and electric companies, Pennsylvania courts have emphasized the extreme dangers that elements like gas and electricity present. "Where explosive compounds are in play, the measure of care arises with the degree of hazard involved," *Hemrock v. Peoples Natural Gas Co.*, 423 Pa. 259, 223 A.2d 687, 692 [1966]. The power of uncontrolled gas and electricity [4] to destroy and disfigure is so great, that upon their purveyors the law imposes the "highest standard of care practicable," *Densler v. Metropolitan Edison Electric Co.*, 235 Pa.Super. 585, 345 A.2d 758, 761 [1975], quoting with approval *Fitzgerald v. Edison Electric Illuminating Co.*, 200 Pa. 540, 543, 50 A. 161–2 [1901]. In the maintenance and repair of underground gas pipes, a gas company must take "every reasonable precaution suggested by experience and the known dangers of the subject." *Moidel v. Peoples Natural Gas Co.*, 397 Pa. 212, 154 A.2d 399, 402 [1959], quoting with approval *Koelsch v. Philadelphia Co.*, 152 Pa. 355, 362, 25 A. 522, 524 [1893]. And when deciding if a gas company has met this very high standard of care, its conduct is not appraised by the knowledge of the intelligent layman, but rather by that of the expert in underground pipe corrosion, *Hemrock v. Peoples Natural Gas Co.*, supra, 223 A.2d at 690. Finally, the existence of particular facts—such as the age of the pipeline or the corrosiveness of the soil—may elevate the gas company's standard of care to even higher levels, see *Goodman & Theise, Inc. v. Scranton Spring-Brook Water Service Co.*, 352 Pa. 488, 493, 43 A.2d 111 [1945].

■ A gas company's general duty of care with respect to underground pipes was summarized by the court in *Hemrock v. Peoples Natural Gas Co.*, supra.

The responsibility of a gas company is to see to it that the highly inflammable

---

4. Pennsylvania courts have drawn no perceptible distinction between the duties owed by gas and electric companies, compare *MacDougall v. Pennsylvania Power & Light Co.*, 311 Pa. 387, 166 A. 589 [1933] *with Hemrock v. Peoples Nat. Gas Co.*, 423 Pa. 259, 223 A.2d 687, 692 [1966].

commodity it is selling is contained within a casing, formidable enough to withstand the pressure or violence to which it could foreseeably be subjected.

223 A.2d at 689.

This general duty of care subsumes many specific duties pertaining to the prevention of pipeline leaks caused by corrosion, namely, the duty to install a safe pipeline protected from corrosion, the duty to investigate clues suggesting future leaks, and the duty to inspect the pipeline regularly. Chronologically, the conduct of NFG with respect to the 20″ pipeline in the area of the Marine Bank drive-in branch falls into the following stages.

1. *1950–1963: The 38th Street Pipeline is Unprotected.*

From the time of its installation in 1950 to November 1963, the bare 20″ pipeline running under 38th Street was not cathodically protected from corrosion. The soil in the area of the pipeline near the Marine Bank drive-in branch is considered "moderately to very" corrosive. (Fitzgerald, T. pp. 6–7).[5] Under these conditions and without cathodic protection, NFG could have reasonably expected corrosion to penetrate the pipeline between 1965 and 1970. (Fitzgerald, T. pp. 74–75). In fact, in 1963 before cathodic protection was installed, a pipe to soil potential survey was conducted which indicated that the electrical potential of the pipeline in the area of the drive-in branch ranged from 600 to 650 mv. (Pl. Ex. 15). These measurements indicate a condition conducive to corrosion.

Although the installation of bare 20″ pipe without cathodic protection may have been standard industry practice in 1950, the installation of coated pipe with cathodic protection was available in 1950–1963, was recognized as a superior method, and might well have prevented the corrosion that eventually penetrated the pipe and caused the 1973 explosion. (Fitzgerald, T. pp. 15, 74–75). As long ago as the late 1940's, galvanic cathodic protection has been used successfully in urban areas with high resistivity soil. (Fitzgerald, T. p. 76).

Two legal principles apply to the conduct of NFG from 1950 to 1963. First, NFG was obligated to install a safe pipeline in 1950 and to observe the "highest standard of care practicable" to protect the pipeline from corrosion, *Densler v. Metropolitan Electric Co.,* supra, 345 A.2d at 761. That the installation of bare pipe without cathodic protection was the standard industry practice in 1950 does not excuse NFG's failure to install coated pipe with cathodic protection if the gas company should have known of the benefits of cathodic protection in protecting pipelines buried in soil as corrosive as that in the bank area, a state of knowledge we do not hesitate to attribute to NFG in view of the use of cathodic protection by others, see *Hemrock v. Peoples Natural Gas Co.* supra, 223 A.2d at 692. Indeed, the negligence of an industry is no defense to a gas company which should know better.

Nevertheless, we do not find NFG negligent for failing to install coated pipeline with cathodic protection in the 1950–1963 period. We turn instead to the second principle: that NFG is held to be aware of the probable corrosion of bare pipe in corrosive soil, see *Moidel v. Peoples Natural Gas Co.,* supra, 154 A.2d at 401–02; *Hemrock v. Peoples Natural Gas Co.,* supra, 223 A.2d at 692–93; *Koelsch v. Philadelphia Co.,* supra, 25 A. at 523.

We attribute to NFG the reasonable expectation that corrosion will penetrate a 20″ bare pipeline buried in corrosive soil within 15 to 20 years of its installation, and that an unprotected pipeline would at least begin to corrode if left unprotected in the moderate to very corrosive soil in the area of the drive-in branch. Accordingly, the knowledge attributed to NFG of the likelihood of corrosion from 1950–1963 becomes an important factor in setting the standard of care applicable to later times.

2. *1963–1970: Anodes Are Installed.*

By 1963, advances in corrosion engineering imposed two duties on gas companies

---

**5.** Reference is to the trial testimony of John H. Fitzgerald, III, the plaintiff's expert witness.

with underground pipelines: 1) the duty to install adequate cathodic protection, and 2) the duty to inspect regularly to insure that the cathodic protection remained effective. In translating these duties into certain required acts of due care, it is important to realize that the law requires a higher degree of care of NFG in the protection and inspection of a bare 20″ pipeline which has been buried in corrosive soil for thirteen years than if a new pipeline were being installed.

(a) *The Duty to Install an Adequate System.*

In 1963, both the galvanic and the impressed current methods were available to protect the 38th Street pipeline from corrosion. The issue of whether the cathodic protection installed was adequate does not depend in this case on the type of cathodic protection installed. So long as the protection is adequate, the law is indifferent to the method used. NFG is not negligent for failing to install an impressed current system if the galvanic method NFG installed provided adequate protection.

The evidence clearly indicates, however, that NFG from and after 1963 failed to install and maintain an adequate method of cathodic protection and that this failure was a proximate cause of the plaintiffs' injuries. The plaintiffs' expert witness testified that 17 lb. magnesium anodes should have been placed every 7′ to 10′ to protect the bare 20″ steel piping adequately in the corrosive soil located between Liberty and Poplar Streets on 38th Street. In 1963, NFG installed anodes on the 38th Street

pipeline approximately every 250′. Between Liberty and Poplar Streets, a distance of about 350′ in a populated commercial area, only two anodes were installed—at points 50′ and 300′ east of Liberty Street. The leak which caused the 1973 explosion occurred 230′ east of Liberty, or 70′ from the nearest anode installed in 1963.

The plaintiffs' expert testified that an adequate galvanic system of cathodic protection should have been installed in 1963, and that NFG personnel should have known that the 1963 installation was insufficient for adequate protection (Fitzgerald, T. p. 20). The plaintiffs' expert concluded that if an adequate galvanic system had been installed in 1963, the 1973 explosion would not have occurred.[6] (Fitzgerald, T. p. 22).

The defendant introduced no expert witness of its own to refute this proof of liability. Based upon certain statements of the plaintiffs' expert witness on cross-examination, the defendant argued that NFG may have installed the anodes in 1963 according to the hot spot method which was proper in 1963 if done correctly. (Fitzgerald, T. pp. 54–55). This argument overlooks the testimony that no matter how skillfully NFG may have placed the anodes at the points of highest electrical potential, two anodes alone could not have provided adequate cathodic protection for the segment of the 38th Street pipeline between Liberty and Poplar Streets. In addition, we are suspicious of the defendant's argument that the map shows schematic, not actual, anode placement because in response to Interrogatory 112(d)(3) the defendant indicated that

---

**6.** At trial, counsel for the defendant objected to the admission of expert testimony on whether the installation of an adequate cathodic protection system in 1963 would have prevented the 1973 leak. He based his objection on the ground of relevance, namely, that subsequent acts like the installation of additional anodes in 1970 and the pipe to soil measurements taken in 1970 render the adequacy of the 1963 anodes irrelevant to the issue of NFG's negligence. The Court considered the merits of this objection before basing liability on this testimony and concluded that the evidence was properly admitted. Only events which retarded the development of corrosion in the 1963–1973 period

would have undercut the relevance of the testimony in question. According to all the evidence, aside from the repair of the 1970 leak, NFG did nothing to retard corrosion which may have begun in the 1950–1963 period when the bare pipeline was completely unprotected or in the 1963–1973 period when the pipeline was inadequately protected. An event which could have remedied existing corrosion, and hence rendered the expert's testimony irrelevant, was the replacement of the entire section of the pipeline in the vicinity of the Marine Bank branch, but this replacement did not occur until after the 1973 explosion.

the anodes were actually placed at points 50' and 300' east of Liberty Street, a statement consistent with the anode placement indicated on the map.

■ Accordingly, we conclude that NFG was negligent in failing to install an adequate galvanic system of cathodic protection in 1963, and that this failure was a proximate cause of the 1973 explosion which injured the plaintiff Lou Ann Karle.

(b) *The Duty to Inspect.*

■ The second legal duty pertaining to the 1963–1970 period is the defendant's duty to inspect the pipeline annually to insure that the 1963 installation provided adequate cathodic protection. Pennsylvania courts have clearly established that companies have a duty to inspect their underground pipelines and have found the failure to inspect regularly a proximate cause of later explosions. See, e. g. *Hemrock v. Peoples Natural Gas Co.,* supra; *Koelsch v. Philadelphia Co.,* supra; *Goodman & Theise v. Scranton Spring-Brook,* 352 Pa. 488, 43 A.2d 111 [1945]; *Fore v. United Natural Gas Co.,* 436 Pa. 499, 261 A.2d 316 [1970].

> It is not sufficient for (a gas company) merely to install proper lines and fixtures but it is required to maintain them, and this entails inspection from time to time and watchfulness for conditions incident to natural wear and tear.
>
> .   .   . if the gas company knows that there are defects in   .   .   . [the] pipe, or is in possession of facts which should reasonably inform it that it is unsafe, it then becomes the gas company's duty to investigate the safety of the pipe before it continues to use it for the transportation of gas, and if it fails in that duty it becomes liable for any resulting accident.
>
> *Goodman & Theise v. Scranton Spring-Brook,* supra, 43 A.2d at 113.

In determining the nature and frequency of inspection required to fulfill a gas com-

pany's duty to take "every precaution practicable", we are guided by the uncontroverted testimony of the plaintiffs' expert witness who stated that NFG should have conducted pipe to soil potential surveys after the original 1963 installation and approximately once a year thereafter.[7] (Fitzgerald, T. pp. 22–23). By 1963 this uncoated pipe had already been buried in corrosive soil for 13 years, or more than one-half of its expected life. Only by regular inspection of the pipeline itself could NFG determine whether the anodes installed in 1963 were providing adequate cathodic protection to the 38th Street pipeline. NFG did not conduct a pipe to soil potential survey after installing cathodic protection in 1963 until 1970, after the pipeline leaked for the first time.

■ Had NFG conducted at least one pipe to soil survey in the seven years from the initial installation of cathodic protection to the time of the 1970 leak it would have discovered that the 38th Street pipeline between Poplar and Liberty was not adequately protected from corrosion. Where there is a danger of sudden, violent gas explosions, we include within NFG's duty to use the "highest standard of care practicable" the obligation to take some periodic pipe to soil measurements from 1963 to 1970, *Densler v. Metropolitan Electric Co.,* 345 A.2d at 761. The duty of NFG to inspect is especially clear in view of its presumed knowledge of the corrosiveness of the soil, the inadequacy of the 1963 protection, and the age of the pipeline. Accordingly, we find NFG failed to discharge its duty to inspect the 38th Street pipeline and that this failure was a proximate cause of the plaintiff Lou Ann Karle's injuries.

3. *1970–1973: The Pipeline Leaks for the First Time.*

■ On January 13, 1970, at a point 247' east of Liberty Street, corrosion penetrated

---

7. Other authorities occur with the plaintiffs' expert witness that pipe to soil measurements should be conducted annually on cathodically protected pipelines, see A. W. PEABODY, CONTROL OF PIPELINE CORROSION 164. In addition, regulations promulgated by the

Secretary of the Department of Transportation indicate that pipe to soil measurements should be taken annually, 49 C.F.R. § 192.465 [1976]. NFG's probable violation of these regulations, however, does not constitute negligence per se, see Part III(C) *infra.*

the 38th Street pipeline and gas escaped into the same Marine Bank drive-in office later destroyed by gas explosion in 1973. Thus, as early as 1970, NFG knew that the pipeline had corroded and that a ready avenue existed for gas to escape into the drive-in office. The 1970 leak intensified three legal duties: a) the duty to install an adequate system of cathodic protection; b) the duty to investigate the 1970 leak adequately; and c) the duty to inspect the pipeline regularly.

### (a) *The Duty to Install an Adequate System.*

From 1950 to 1973, NFG was under a continuing duty to protect the 38th Street pipeline from corrosion. But after the 1970 leak, NFG's duty was greatly intensified. After the 1970 leak, NFG knew that its previous efforts at cathodic protection had failed to protect the pipeline from corrosion. Accordingly, in 1970, after the first leak, NFG should have realized that other corrosion pits may have already infected the 38th Street pipeline and that rigorous measures were required to prevent existing corrosion from penetrating the pipeline and causing future leaks in the area of the bank.

After locating the 1970 leak and uncovering 6' to 12' of the pipeline, an NFG repair crew clamped the leak and installed one or two more anodes at the point of the 1970 leak, 247' east of Liberty Street. No pipe to soil survey was taken before the anodes were installed to determine the adequacy of cathodic protection from 1963 to 1970 but NFG employed a corrosion engineering consulting firm to conduct a pipe to soil survey in September 1970. This pipe to soil survey indicated a potential ranging from 900 mv. to 1020 mv. in the vicinity of the Marine Bank drive-in branch.

We find these additional measures inadequate to provide the degree of cathodic protection necessary to fulfill NFG's escalating duty to protect the 38th Street pipeline from corrosion. The installation of one or two anodes at a hot spot may be sufficient for a new pipe, but it is grossly inadequate when the history and conditions of the 38th Street pipeline are considered. In 1970, the bare steel pipeline had been buried for 20 years in corrosive soil without adequate cathodic protection. Corrosion penetrated the pipeline and gas leaked into the Marine Bank drive-in branch. For at least 13 years, from 1950 to 1963, the electrical potential of the pipeline remained between 600 mv. to 650 mv., indicating a pipe to soil potential dangerously conducive to corrosion. For the next seven years, from 1963 to 1970, the protection and inspection procedures of the defendant were obviously inadequate to insure proper cathodic protection.

Despite the deterioration caused by burial for 20 years in corrosive soil, the probability of the 1973 leak could have been "greatly reduced" by the installation of an adequate galvanic or impressed current method of cathodic protection in 1970. (Fitzgerald, T. p. 25). NFG did not install an impressed current system in 1970 so its liability under this duty depends upon whether its galvanic system was adequate.

The anodes installed in 1970 failed to establish an adequate galvanic system. The plaintiff's expert witness testified that, to achieve complete cathodic protection in the vicinity of the Marine Bank drive-in branch, NFG should have placed one 17 lb. magnesium anode every 7' to 10'. While the installation of the two 1970 anodes may have improved the protection within 3' to 5' of the first leak, their effect was necessarily minimal at the site of the 1973 leak which was 17' away from the 1970 leak. While NFG may have barely evaded an obligation to replace the entire section of the 38th Street pipeline between Liberty and Poplar Streets after the first leak, it at least should have placed 17 lb. magnesium anodes every 7' to 10' in this area.

NFG leans heavily on the 1970 test as a general defense to many of the allegations of liability in the 1970–1973 period. The Defendant gas company argues that the 1970 pipe to soil survey, conducted after the 1970 installation of anodes, indicates adequate cathodic protection in the vicinity of the bank. The 1970 test indicated a poten-

tial of over 900 mv. and potentials of over 850 mv. generally indicate a likelihood that more corrosion will not occur. (Fitzgerald, T. pp. 84–87).

■ But the 1970 test results are no defense for two reasons:

First, we find the defendant's reliance on the 1970 tests as unjustified and not reasonably warranted in view of the circumstances which preceded the 1970 leak. By 1970 the pipeline had been buried in corrosive soil for 20 years. From 1950 to 1963, the pipeline was totally without cathodic protection, and corrosion was abetted by the low potential of 600 mv. to 650 mv. in the area of the bank. From 1963 to 1970, the pipeline was inadequately protected. Since no pipe to soil survey was taken between 1963 and 1970, NFG never knew whether the anodes installed in 1963 were even working let alone providing adequate cathodic protection. In 1970, the pipeline leaked gas into the Marine Bank. After one or two anodes were installed at the point of the 1970 leak, another pipe to soil survey was conducted and indicated potentials in the Bank area of generally over 900 mv., which NFG asserts as a defense to its failure to install anodes every 7′ to 10′ in 1970. Considering that the pipeline was largely unprotected from corrosion throughout its 20 year life, that such a pipeline will corrode if unprotected for 20 years, and that the pipeline already leaked in 1970, we reject NFG's contention that the 1970 reading exonerated it from installing anodes every 7′ to 10′ in the area of the Marine Bank. A gas company's duty to use the "highest standard of care practicable" required NFG to do more than to consider the 1970 reading alone in evaluating the adequacy of the cathodic protection on the 1970 pipe. Its heavy reliance on the 1970 test ignores all facts about the 38th Street pipeline except the one and only fact which indicated that more protection was not necessary.

Second, the accuracy of the high 1970 readings, according to expert testimony, is suspect. In view of the corrosive soil, the type of pipe used, and the few anodes placed on the pipe, the plaintiff's expert witness found it "very hard to understand how the potential could be as high as indicated" on the 1970 test, (Fitzgerald, T. p. 26). Readings of 650–680 mv., obtained in a 1973 test after the explosion, were more plausible for the soil conditions in the vicinity of the Marine Bank. The 1973 readings are about the same as the 1963 readings which were taken before any cathodic protection was installed. (Fitzgerald, T. p. 29).

■ Accordingly, we find that NFG failed to install adequate cathodic protection in 1970, and that this failure was a proximate cause of the 1973 explosion and the plaintiff's injuries.

(b) *The Duty to Investigate.*

■ Secondly, NFG was under a duty to investigate a reasonable length of the 38th Street pipeline contiguous to the 1970 leak for other leaks or for corrosion pits that might later penetrate the pipeline before continuing to use it for the distribution of natural gas. Once a pipeline leaks, Pennsylvania courts have imposed a clear and specific duty on gas companies to inspect the surrounding portion of the pipeline. In *Heller v. Equitable Gas Co.,* 333 Pa. 433, 3 A.2d 343 (1939), the defendant gas company was called to the plaintiff's home to repair an apparent gas leak several months before the home was destroyed by the explosion of gas leaking at another point on the pipeline. A leak was discovered and the gas company replaced with new pipe a 12′ section of the pipeline. The pipeline which had leaked had been buried in filled ground composed of rubbish, decayed wood, and ashes—a mixture considered conducive to corrosion. The Pennsylvania Supreme Court held that the gas company failed to comply with its duty to investigate the neighboring parts of the pipeline it had replaced for signs of future corrosion penetration.

. . . [W]hen defendant's employees undertook to ascertain the cause of leaking gas upon plaintiff's premises, and discovered a corroded and perforated service line and then proceeded to repair it, they

were under a duty to make an adequate inspection to determine whether the remaining sections of the line were in the same condition as those which they had removed and replaced with new pipe. . . . Defendant was obligated to go further [than to merely install a new section of pipe], in view of the knowledge acquired of the condition of the pipe and the character of the ground in which it was laid, and to ascertain whether the corrosion extended to the remaining portions of the line . . .

3 A.2d at 344.

A gas company's duty to investigate arose again in the more recent case of *Fore v. United Natural Gas Co.*, 436 Pa. 499, 261 A.2d 316 [1970]. Two days before the plaintiff's house was destroyed by the explosion of gas which had leaked from a gas pipe, the defendant gas company located two leaks in gas pipes within the plaintiff's house. The house was destroyed by a leak in a section of the pipeline which the defendant did not inspect. The Pennsylvania Supreme Court cited with approval the following passage from *Goodman & Theise, Inc. v. Scranton Spring-Brook Water Service,* supra:

> [I]f the gas company knows that there are defects in such a pipe, or is in possession of facts which should reasonably inform it that it is unsafe, it then becomes its duty to investigate the safety of the pipe before it continues to use it for the transportation of gas, and if it fails in that duty it becomes liable for any resulting accident.

43 A.2d at 113.

In the present case, NFG simply clamped the 1970 leak and installed anodes. Even though it knew that the 38th Street pipeline had been buried in corrosive soil for more than 20 years, NFG limited its visual inspection of the pipeline to an area of about 6′ on each side of the 1970 leak. The leak responsible for the 1973 explosion occurred approximately 17′ away from the 1970 leak.

■ The duty to investigate for other corrosion pits which might penetrate the pipeline in the future requires more than a visual inspection of 6′ of the pipeline on each side of the leak. Taking a pipe to soil measurement after the installation of anodes or conducting flame ionization tests or leak surveys, which only detect the presence of existing leaks, in no way satisfy NFG's obligation to look for other corrosion pits in the vicinity of the 1970 leak. Indeed, the court in *Heller* ruled that gas companies were obligated to investigate the remaining sections of a pipeline after the defendant gas company had replaced a 12′ section in which the leak had occurred.

■ We find the preponderance of the evidence supports our finding that the failure of the NFG to investigate properly is a proximate cause of the 1973 leak. The plaintiff established that the gas company could reasonably expect corrosion to penetrate the 38th Street pipeline buried in the corrosive soil around the Marine Bank branch by 1970. The 1970 leak verified this expectation. Since the defendant introduced no evidence that the 1973 leak began to corrode after the 1970 leak was repaired, and since an 1100′ section of the 38th Street pipeline was replaced after the 1973 explosion and not available for inspection, we are left with the inference that a more extensive visual inspection of the pipeline in 1970 would have disclosed the beginnings of the 1973 leak whose repair would have prevented the 1973 explosion. ". . . [T]he plaintiff's evidence does not have to be such as to preclude any other possible explanation for the mishap," and a reasonable inference may furnish the basis for liability, *Hemrock v. People's Natural Gas Co.* supra, 423 Pa. at 271, 223 A.2d at 693.

> It is not necessary, under Pennsylvania law, that every fact or circumstance point unerringly to liability; it is enough that there be sufficient facts for the jury to say reasonably that the preponderance favors liability. . . . The facts are for the jury in any case whether based upon direct or circumstantial evidence where a reasonable conclusion can be arrived at which would place liability upon the defendant.

*Smith v. Bell Telephone Company of Pa.,* 397 Pa. 134, 138–39, 153 A.2d 477, 480 [1959].

Accordingly, we find NFG failed to meet its duty to investigate the surrounding pipeline after the 1970 leak, and that this failure was one proximate cause of the 1973 explosion.

### (c) *The Duty to Inspect.*

Third, NFG was under a heavier duty to inspect in the 1970–1973 period to insure that the 38th Street pipeline was protected from further corrosion. Although the duty to inspect regularly existed since the pipeline was installed in 1950, it became more critical after the pipeline leaked for the first time. The law is clear that a gas company is obligated to inspect regularly. It is undisputed that NFG failed to conduct pipe to soil potential surveys in 1971, 1972, and 1973.

Plaintiff's expert witness on cross-examination stated that the 1970 readings indicated adequate cathodic protection and that NFG could expect those readings to continue for several years. From this the defendant concludes it was not negligent in failing to conduct pipe to soil measurements from 1970 to 1973. We have already discussed the possible inaccuracy of the 1970 readings and that NFG was not reasonably justified in relying upon them in view of all of the other circumstances indicating future corrosion. But the real flaw in the defendant's argument is that implicit within its justification for not taking pipe to soil measurements from 1970 to 1973 is that all of the anodes which operated in 1970 would continue to operate effectively until 1973. While this presumption may be reasonable with respect to the anodes installed in 1970, it is clearly unreasonable with respect to the anodes installed in 1963, which even by 1970, were approaching the expiration of their useful life. The continued reliability of the 1970 cathodic protection readings depended as much on the continued effectiveness of the 1963 anodes as on that of the anodes installed in 1970. Just as a chain is no stronger than its weakest link,

the chain of cathodic protection indicated by the 1970 readings is no more lasting than the oldest anode. For this reason, we find the defendant's failure to conduct yearly pipe to soil measurements a proximate cause of the 1973 explosion.

Overriding all of this analysis, however, is that the defendant's duty to use every reasonable precaution clearly includes the duty to take pipe to soil measurements regularly and that this duty can in no way be satisfied by resting on presumptions about the accuracy of the 1970 readings and the continuing effectiveness of the 1963 and 1970 anodes. This duty included the burden of conducting soil to pipe surveys periodically when the possibility of human injury and suffering weighed so heavily on the other side of the scale.

Accordingly, we find NFG failed to inspect the 38th Street pipeline regularly and that this failure is a proximate cause of the 1973 explosion.

### B. STRICT LIABILITY IN TORT.

Pennsylvania has adopted the Restatement, Second, of Torts § 402A which subjects to strict liability those who sell products unreasonably dangerous to the user because of defective manufacture or design. *Webb v. Zurn,* 422 Pa. 424, 220 A.2d 853 [1966]. Pennsylvania courts have extended § 402A liability to include defects in unreasonably dangerous containers which cause injury even though the substances held by the containers are free from defect, see *Bialek v. Pittsburgh Brewing Co.,* 430 Pa. 176, 242 A.2d 231 (1968). A prerequisite to strict liability under § 402A is that the container reaches the consumer without substantial change in the condition in which it was sold. Accordingly, that a product has become unreasonably dangerous through neglect of another after it has left its place of manufacture is a defense to strict liability under § 402A, *Kuisis v. Baldwin-Lima-Hamilton,* 457 Pa. 321, 319 A.2d 914 [1974]; *Burbage v. Boiler Engineering & Supply Co.,* 433 Pa. 319, 249 A.2d 563 [1969].

The plaintiffs argue that NFG is liable under § 402A for transporting gas in an unreasonably dangerous pipeline. A prerequisite of § 402A liability is that the plaintiff either plead or prove that the pipeline was unreasonably dangerous because of defective manufacture or design. The plaintiffs never alleged that the pipeline was defectively manufactured or designed or that it was in any sort of defective condition when it was buried in 1950. Moreover, the plaintiff's obligation to prove defective manufacture or design is not satisfied by showing that the pipeline became unreasonably dangerous through NFG's neglect. While NFG's negligence in maintaining the pipeline may amount to a defense to § 402A liability on the part of the manufacturer of the pipeline, if it were a party to this action, such negligence cannot be the basis of a 402A claim against NFG who merely abused a pipeline which was apparently fit when installed. Accordingly, strict liability under § 402A is not an appropriate theory of liability under the facts of this case, and we do not base our finding of liability upon it.

## C.  NEGLIGENCE PER SE.

The violation of a federal statute or regulation may provide the basis for a finding of liability under Pennsylvania law provided three elements are present:  1) the statute or regulation must clearly apply to the conduct of the defendant;  2) the defendant must violate the statute or regulation;  and 3) the violation of the statute must proximately cause the plaintiff's injuries, see *Kaplan v. Kaplan*, 404 Pa. 147, 171 A.2d 166 [1961]; *Steele v. Peoples Natural Gas Co.*, 386 Pa. 439, 127 A.2d 96 [1956]; *Listino v. Union Paving Co.*, 386 Pa. 32, 124 A.2d 83 [1956]; *Moore v. Sylvania Electric Products, Inc.*, 454 F.2d 81 [3d Cir. 1972]; *Millard v. Municipal Sewer Authority of Township of Lw. Makefield*, 442 F.2d 539 [3d Cir. 1971].

It is well established that federal regulations have the same force as the federal statute under which they are promulgated, see *Paul v. United States*, 371 U.S. 245, 83 S.Ct. 426, 9 L.Ed.2d 292 [1963]; *Rodway v. U. S. Department of Agriculture*, 514 F.2d 809 [D.C.Cir. 1975]; *Farmer v. Philadelphia Electric Co.*, 329 F.2d 3 [3d Cir. 1964]. Pursuant to the Natural Gas Pipeline Safety Act, 49 U.S.C. § 1671 [1968], the Secretary of Transportation has promulgated several regulations which deal with the control of corrosion of underground pipelines. Although NFG has arguably violated two of these regulations, neither regulation so clearly applies to the maintenance of the 38th Street pipeline that we can base liability upon its alleged violation.

Utility companies are required by 49 C.F.R. § 192.457(b), 36 Fed.Reg. 12,302 [1971] to cathodically protect underground steel pipelines installed before August 1, 1971 in areas where active corrosion is found. Although NFG discovered corrosion on the 38th Street pipeline in 1970, the regulations in force from 1971 to 1973 did not require that NFG install cathodic protection until August 1, 1976. Accordingly, presuming that the cathodic protection installed in 1963 and in 1970 by NFG was inadequate to meet the standards prescribed by the Department of Transportation in the 1970–1973 period, NFG did not violate § 192.457(b) from 1970–1973 because the regulation allowed NFG to August 1, 1976 to install the required levels of cathodic protection.

The second regulation arguably violated is 49 C.F.R. § 192.465, 36 Fed.Reg. 12,303 [1971], which requires that utility companies inspect underground pipelines which are "under cathodic protection" at least once a year to insure that the level of cathodic protection meets the requirements of § 192.463. Section 192.463(a) requires:

Each cathodic protection system *required by this subpart* must provide a level of cathodic protection that complies with one or more of the applicable criteria contained in Appendix D of this part.

49 C.F.R. § 192.463(a) (emphasis added). 36 Fed.Reg. 12,302 [1971].

The standards set forth in § 192.-463(a) apply only to "cathodic protection

systems required by this subpart." Since the cathodic protection system installed by NFG on the 38th Street pipeline in 1963 and in 1970 was clearly not required by the applicable regulations, it is questionable whether NFG was obligated to inspect the 38th Street pipeline annually to insure that the anodes installed on the pipeline provided a level of cathodic protection which met the standards set forth in § 192.463(a). When read together, § 192.463(a) and § 192.465 present an ambiguous statement of NFG's duty to inspect the 38th Street pipeline. It is unclear whether the language "each pipeline . . . under cathodic protection" in § 192.465 pertains to all pipelines under cathodic protection or just those pipelines with cathodic protection systems mandated by the regulations. This ambiguity prevents the clear application of § 192.465, which requires annual inspection of cathodic protection systems, to the 38th Street pipeline. The law in Pennsylvania is clear that unless the regulations apply without ambiguity to the conduct of the defendant, the regulations are not a proper basis for liability on the grounds of negligence per se.

## IV. DAMAGES

The basis of liability is negligence, and NFG is liable for all damages proximately caused by its lack of reasonable care. At trial, the Plaintiffs offered evidence in support of the following elements of damages together with evidence of the monetary amounts.

1) Total medical bills (as of August 18, 1976):  $ 8,116.90

2) Wage loss (as of August 18, 1976):  4,087.31

3) Future estimated medical and hospital bills  30,000.00

4) Wage loss during future scar revisions  5,192.31

The following elements of damages are not subject to specific monetary proofs:

5) Loss of consortium

6) Pain, suffering, inconvenience, and embarrassment: past and future

7) Scarring

The defendant has not contested the plaintiff's total medical bills or her loss of wages to the time of trial, and the Court awards these two elements to the Plaintiffs.

A disputed element of damages is the cost of future surgery. Although the explosion left her with no permanent disability, Lou Ann Karle sustained multiple second and third degree burns on her face, throat, arms, hands, legs and chest. The burns covered 16% to 18% of her body. Dr. Frank M. Tooze, a plastic surgeon, is Mrs. Karle's treating physician and testified as an expert witness at trial. In 1975, Dr. Tooze performed a staged surgical procedure [8] to reduce the size of the scars on Mrs. Karle's arms, chest and legs. Dr. Tooze recommended that Mrs. Karle undergo three or four more of these procedures—spaced over five years to achieve maximum cosmetic improvement. Dr. Tooze testified that the cost of this future surgery at the rates prevailing at the time of trial would be $30,000 which includes doctors' fees, hospital costs, and other medical expenses.

The fourth element of damages is Mrs. Karle's loss of wages during the recuperation period which follows each scar reduction procedure performed on her legs. After each scar reduction procedure on one of her legs, the leg must be placed in a splint for at least six weeks to minimize stress on the newly sutured wound. Because it is difficult for Mrs. Karle to perform her duties as a bank teller with one of her legs in a splint, she must be absent from work during the recuperation periods following each scar revision procedure. Each leg requires at least three revision procedures, and the procedures cannot be done on both legs at the same time. Accordingly, during the course of the procedures, Mrs. Karle will be absent from work for six periods of eight weeks duration. Based upon Mrs. Karle's annual salary at the time of trial of

8. A "staged surgical procedure" in Mrs. Karle's case involves several separate surgical operations done at different times. Two or more areas may be surgically treated at the same time, but as noted herein both legs cannot be done at the same time.

$5,625.00, the future medical procedures will cause her to lose $5,192.31 in wages, and the Court awards her this amount also.

The remaining elements of damage are those of Lou Ann Karle for pain, suffering, inconvenience, scarring and its consequent embarrassment. The scars are principally to the legs, above and below the knees, the upper inside of the right arm, over and under the right breast, and both hands. They were still vivid and unsightly at the time of trial. The plastic surgery had left extensive, vivid scar lines. While they may be reduced by further plastic surgery, the process will require several years of this young woman's life, during which she must bear the visible scars. She was 23 years of age at the time of trial.

The course of treatment for the original burns was lengthy and painful. She was hospitalized from December 18, 1973 until discharged to home care on January 2, 1974. She needed treatment at home for an additional 8 weeks. She returned to work on April 15, 1974. She underwent four further sessions of plastic surgery to her legs on January 13, 1975, March 10, 1975, April 28, 1975, and July 10, 1975. After each session her legs were kept in splints for 6 to 8 weeks. She wears slacks and long sleeved blouses all the time, she lost hair in the fire which was long in growing back. She has foregone swimming and playing tennis which she formerly enjoyed.

We feel that the sum of $100,000 is a proper amount for the pain, suffering, inconvenience, scarring and embarrassment that she has suffered and will continue to suffer, and this amount will be awarded to Lou Ann Karle.

Her husband has lost the companionship, domestic services, and other elements which are included under the general term of consortium and may expect further losses in the future and we consider the sum of $20,000 as a proper measure of this loss, and such amount will be awarded to him.

In summary, the damages fixed by the Court to the plaintiffs are:

| Michael Karle, husband: | |
|---|---:|
| Medical bills to Aug. 18, 1976 | $ 8,116.90 |
| Estimated future medical and hospital bills | 30,000.00 |
| Loss of consortium | 20,000.00 |
| | $58,116.90 |
| Lou Ann Karle, wife: | |
| Loss of wages to Aug. 18, 1976 | 4,087.31 |
| Future wage loss due to contemplated plastic surgery | 5,192.31 |
| Pain, suffering, inconvenience, embarrassment and scarring | 100,000.00 |
| | $109,279.62 |