Irvin GOLDSTEIN, David Goldstein, Jay Glickman, Lawrence Needle,

v.

MILTON BROKERAGE ASSOCIATES, et al.

Civ. A. No. 85–45.

United States District Court, E.D. Pennsylvania.

March 17, 1986.

Robert B. Bodzin, Philadelphia, Pa., for plaintiffs.

Christopher P. Leise, Philadelphia, Pa., for Milton.

Albert Bricklin, Philadelphia, Pa., for Allied Programs.

## MEMORANDUM AND ORDER

HUYETT, District Judge.

Plaintiffs have moved for partial summary judgment in this professional liability action against Milton Brokerage Associates, Inc., their former insurance broker. In this motion, plaintiffs seek a determination that defendant Milton was negligent *per se* in failing to comply with the Pennsylvania Surplus Lines Law, 40 Pa. Stat.Ann §§ 1006.1–.19 (Purdon 1971) (the Law). As explained below, I will deny the motion because of the existence of factual issues concerning proximate cause. I do agree with plaintiffs, however, that third-party defendant Fred Rosenberg acted as an agent of Milton, so that the brokerage company must be responsible for his dealings with plaintiffs.

## I. INTRODUCTION

Plaintiffs, owners of residential rental properties in the Philadelphia area, brought this action for declaratory judgment and damages against Milton, a New York insurance broker. In turn, Milton has asserted claims for contribution and indemnity against third-party defendants Allied Programs Corporation, an insurance marketing firm, and Rosenberg, a broker formerly affiliated with Milton. The case arises out of an insurance contract between plaintiffs and Ambassador Insurance Company, which is now insolvent. Plaintiffs seek a declaration that Milton should reimburse them (up to the limits of their policy with Ambassador) for any liability that they may incur as a result of the insolvency of their former insurer.

## II. FACTUAL BACKGROUND

Plaintiffs obtained insurance coverage from Ambassador beginning in December 1980. Before that, they were insured by Monarch Insurance Company, an insurer licensed in Pennsylvania. In purchasing the Ambassador policy, plaintiffs dealt with Rosenberg as well as with others at Milton. Plaintiffs sought to switch their coverage from Monarch at least in part because of their concern about obtaining a lower premium. The Ambassador policy, which was renewed once, remained in effect through December 1983.

In June of 1980, Rosenberg and Milton signed a contract in which they agreed to split evenly all commissions generated by his sales efforts. The agreement provided that Milton would collect the commissions, keep 50% of each, and pay Rosenberg the other 50%. Rosenberg worked out of Milton's New York City office, and under the terms of the contract, he also had use of Milton's supplies, including stationery and business cards bearing Milton's name. In addition, Milton provided Rosenberg with clerical assistance, including typing, billing, and telephone answering. Rosenberg kept his client files in the office where Milton employees had easy access to them. Final-

ly, Milton had veto power over any business solicited by Rosenberg.

Rosenberg worked closely with Milton personnel, including Phyllis Popper, who was both a major shareholder and the president of the brokerage firm. In particular, Rosenberg and Popper worked together on plaintiffs' account. Popper discussed proposed coverage with Rosenberg, and then sought to obtain a policy through Allied. Allied gave Popper price quotes regarding coverage by two insurers licensed in Pennsylvania. Popper met with and spoke to plaintiff Irvin Goldstein on more than one occasion. And when coverage was finally placed with Ambassador, she was aware of the fact as well as that the company was not licensed in Pennsylvania.

Goldstein paid Rosenberg a consulting fee on top of his commission. Rosenberg retained the full amount of this consulting fee, although Milton collected its usual 50% of plaintiffs' commission. Rosenberg did not receive a consulting fee for each client whom he served. In an affidavit filed with this motion, Goldstein said that he considered Rosenberg to be a representative of Milton.

In December 1984, a Vermont court found Ambassador insolvent, and ordered it to be liquidated. That decision is now on appeal. Six lawsuits have been filed against plaintiffs for risks covered in the Ambassador policy. Plaintiffs seek to have Milton cover any judgments that may be obtained against them in those suits (up to the policy's limit of one million dollars per year).

## III. STATUTORY BACKGROUND

Pennsylvania's Surplus Lines Law deals with the insuring of Pennsylvanians by companies not licensed as insurers in the state—companies known as "surplus lines insurers." The statute requires that those operating in Pennsylvania under its provisions fulfill certain duties. It imposes obligations on the "producing broker" and the "surplus lines agent," both of whom must be licensed by the Insurance Commissioner of Pennsylvania. The Law defines a "pro-

ducing broker" as the individual or corporation who acts "as a representative of the insured ... in a transaction involving placement of insurance coverage with an unlicensed insurer"; and it defines a "surplus lines agent" as the individual or corporation who "effect[s] placement of insurance coverage with an unlicensed insurer." 40 Pa.Stat.Ann. § 1006.2(2)–(3). In this case, plaintiffs' producing broker was Rosenberg/Milton,[1] and their surplus lines agent was Allied, which arranged for the coverage to be purchased from Ambassador.

Under the Law, insurance can be issued by surplus lines carriers only if "at least three licensed insurers, all of which actually issue insurance on the class in question in their normal course of business, have declined to insure the particular risk." § 1006.4(b). These refusals to insure are referred to as declinations. If a policy is issued by a surplus lines carrier, both the producing broker and the surplus lines agent "must execute written declarations ... the producing broker as to his having made a diligent effort to procure the desired coverage from licensed insurers, and the surplus lines agent as to his lack of knowledge as to how the coverage can be procured from licensed insurers." § 1006.-6(a)(1).

The statute was not followed in a number of ways in this transaction. First, Allied was never authorized by Pennsylvania to be a surplus lines agent, and thus acted as one in violation of the Law. *See* § 1006.2(3). Second, before the coverage was placed with Ambassador, Milton obtained verbal price quotes from Allied for only two licensed insurers. But three, not two, companies should have been contacted. Also, the price quotes were insufficient, for the Law requires that the licensed insurers actually refuse to cover the particular risk. *See* § 1006.4(b). Third, neither Milton nor Allied executed the written declarations called for in section 1006.-6(a)(1).

The legislature's purposes in enacting the statute, as set out in section 1006.1, were, *inter alia*, to protect both "Pennsylvania citizens purchasing insurance from unlicensed insurers" and "licensed insurers from unregulated and unfair competition from unlicensed insurers."

## IV. DISCUSSION

In ruling on this motion for partial summary judgment, I must resolve all inferences to be drawn from the facts in favor of Milton, the non-moving party. *Continental Insurance Co. v. Bodie*, 682 F.2d 436, 438 (3d Cir.1982). And I may grant summary judgment here only if it is established that there is no genuine issue as to any material fact and that plaintiffs are entitled to judgment as a matter of law. Fed.R. Civ.P. 56(c); *Small v. Seldows Stationery*, 617 F.2d 992, 994 (3d Cir.1980).

In this motion, plaintiffs assert that Milton's conduct constituted negligence *per se*, and they ask for a declaration to that effect. In order to prevail, plaintiffs must show not only that Milton failed to fulfill its duty under the Law but also that its failure proximately caused their injuries. Because I find that factual questions exist about proximate cause, I cannot grant the motion.

Plaintiffs also claim that Rosenberg's actions should be imputed to Milton, because he functioned as the company's agent. I agree with plaintiffs on this point, and rule that Milton cannot disclaim responsibility for actions carried out by Rosenberg.

### A. *Apparent Authority*

■ Under Pennsylvania Law, Milton is responsible for Rosenberg's acts if the employee had either express or implied authority to function as the company's agent. Apparent authority is "the power to bind a principal in the absence of actual authorization from the principal, but under circumstances in which the principal leads persons with whom his agent deals to believe that the agent has authority." *Universal Com-*

---

1. As discussed below, I find that Rosenberg was an agent of Milton, at least in its dealings with plaintiffs. Accordingly, I will treat the two as one entity.

*puter Systems v. Medical Services Association,* 628 F.2d 820, 823 (3d Cir.1980). In Pennsylvania, "apparent authority flows from the conduct of the principal and not that of the agent." *William B. Tanner Co. v. WIOO, Inc.,* 528 F.2d 262, 266 (3d Cir.1975). I must, therefore, examine both Rosenberg's and Milton's conduct in the context of their dealings with each other and with their clients.

There is no dispute as to how the business relationship between Milton and Rosenberg was structured—only as to what it should be called. But there are a number of facts that suggest either that Rosenberg worked as Milton's agent or that his clients thought that he did. Rosenberg and Milton shared commissions and offices; Rosenberg used Milton's stationery and business cards; he was freely given clerical help and supplies; and he worked closely with Milton employees, including Popper, the corporation's president. In addition, Popper approved Rosenberg's work, at least with regard to plaintiffs' account. She spoke to and met with Goldberg; she communicated with Allied about price quotes; and she reviewed Rosenberg's records. Her continued involvement led Goldberg to conclude—with good reason—that Rosenberg represented Milton.

Finally, control—the hallmark of a principal/agent relationship—existed in this situation. Milton not only had veto power over Rosenberg's choice of clients, but Popper also supervised other matters. For example, she made decisions about marketing and pricing of policies, and took an active role in assisting with Rosenberg's accounts.

Despite all this proof of an intertwined business association, Milton claims that Rosenberg worked as an independent contractor. In support of its position, it points to the consulting fee that Goldberg paid to Rosenberg and that was not shared with Milton. In light of all the evidence to the contrary, I am unpersuaded by Milton's assertion—particularly because it has not shown that Goldberg knew that the bonus

was for Rosenberg alone or knew that Rosenberg was not considered a Milton employee. In the discussion that follows, I will, therefore, treat Rosenberg and Milton as a single actor.

### B. *Negligence Per Se*

In order to succeed on this motion, plaintiffs have the burden of demonstrating that no factual questions exist about negligence *per se* and about proximate cause. I find that they have met their burden on the first ground but not on the second. Although I cannot grant the motion, I will briefly outline how Milton breached its duty under the Law.

In *Congini by Congini v. Pottersville Valve Co.,* 504 Pa. 157, 162, 470 A.2d 515, 517–18 (1983), the Pennsylvania Supreme Court adopted the Restatement standard of negligence *per se:*

§ 286. When Standard of Conduct Defined by Legislation or Regulation Will Be Adopted

The court may adopt as the standard of conduct of a reasonable man the requirements of a legislative enactment or an administrative regulation whose purpose is found to be exclusively or in part

(a) to protect a class of persons which includes the one whose interest is invaded, and

(b) to protect the particular interest which is invaded, and

(c) to protect that interest against the kind of harm which has resulted, and

(d) to protect that interest against the particular hazard from which the harm results.

Restatement (Second) of Torts § 286 (1965). Milton's behavior may be characterized as negligence *per se* only if all the elements of this section are met. Milton argues that its conduct did not amount to negligence *per se* because: no duties were imposed upon it by the Law; and even if it did have a statutory duty, the purpose of that duty

was not to protect plaintiffs. I address both of these assertions below.[2]

### 1. Statutory Duty

■ Milton claims that the Law imposed no duty upon it as producing broker, but only on Allied, the surplus lines agent. Milton notes that section 1006.4(a) prohibits the surplus lines agent from placing insurance with an unlicensed carrier unless a number of conditions are met, including the three declinations from licensed insurers. Milton is without doubt correct to observe that the surplus lines agent has specific obligations under the Law. But the producing broker has duties that are outlined just as clearly. Section 1006.6(a)(1), quoted earlier, requires that *both* the producing broker and the surplus lines agent submit written statements to the commissioner concerning their efforts to obtain insurance from a licensed carrier. Furthermore, the three declinations, called for in section 1006.4(b), are to be obtained by the producing broker. The Law discusses the roles of both the broker and the surplus lines agent; both are essential parties in the securing of insurance coverage; and both must be licensed by the commissioner. Accordingly, Milton cannot avoid its duties under the Law by pointing out the responsibilities of other parties.

### 2. Statutory Purpose

■ As set out in section 1006.1, the Law has a number of purposes, two of which are "to protect Pennsylvania citizens purchasing insurance from unlicensed insurers" and "to protect licensed insurers from unregulated and unfair competition from unlicensed insurers." There is no indication that these purposes do not apply to the statute as a whole. Nonetheless, Milton maintains that the purpose of section 1006.4(b) (which requires the three declinations) is only to protect Pennsylvania insurers. Milton claims that an essential element of negligence *per se* is missing, because the duty that was allegedly breached was not intended for plaintiffs'

protection. *See* Restatement § 286(a). Again, I find that Milton adopts a too narrow reading of the statute.

"The law in Pennsylvania is clear that unless the regulations apply without ambiguity to the conduct of the defendant, the regulations are not a proper basis for liability on the grounds of negligence per se." *Karle v. National Fuel Gas Distribution Corp.*, 448 F.Supp. 753, 768 (W.D.Pa.1978). But there is little ambiguity in this situation. As plaintiffs note, the "producing broker is obligated to investigate the availability of coverage with licensed insurers because of the obvious higher risk to insureds in placing coverage with unlicensed insurers that are not regulated by the Pennsylvania Department of Insurance." Reply Memorandum at 5. The facts of this case so well illustrate that obvious higher risk to Pennsylvania consumers that it is difficult to see how Milton can argue the opposite.

Furthermore, Milton's contention that the declination requirement was enacted to protect Pennsylvania insurers is not to the point, for a statute may have more than one purpose. Accepting Milton's assertion that Pennsylvania insurers lobbied vigorously for the passage of section 1006.4(b) does not negate my finding that the legislators also intended to protect Pennsylvania insurance purchasers. Violations of a statute may be deemed negligent *per se* notwithstanding the law's dual purpose. *See Marks v. Mobil Oil Corp.*, 562 F.Supp. 759, 771–72 (E.D.Pa.1983), *aff'd*, 727 F.2d 1100 (3d Cir.1984) (speed limit law intended both to conserve energy and to promote safety). Accordingly, I conclude that Milton's conduct did meet all the elements of negligence *per se*.

### C. Proximate Cause

■ Milton claims that there were a number of causes of plaintiffs' injuries, including plaintiffs' own desire for less expensive insurance. Although I am uncon-

---

**2.** The Surplus Lines Law became effective in 1966, but strangely has never been interpreted by Pennsylvania courts. I thus must make the following ruling without the advantage of precedent.

vinced that plaintiffs should be penalized for asking Rosenberg to find a competent carrier offering lower premiums, I agree with Milton that factual questions remain about this issue. For example, according to Milton, Ambassador was not considered a high-risk carrier, so that its insolvency could not have been foreseen. Also, Milton insists that there is no guarantee that plaintiffs would have been better protected had it obtained three declinations. Even if Milton had procured three refusals, plaintiffs might nonetheless have opted for coverage with Ambassador, resulting in the same problem.

Proximate cause is normally a matter for the finder of fact. *See, e.g., Jardine v. Upper Darby Lodge No. 1973, Inc.*, 413 Pa. 626, 198 A.2d 550 (1964) (negligence *per se* claim properly submitted to jury on proximate cause issue). In this case, Goldstein was an experienced businessman who understood that Ambassador was not licensed in Pennsylvania and was willing to overlook that problem, because neither he nor Milton expected the carrier to become insolvent. With these circumstances, I cannot conclude, as a matter of law, that Milton's violation of its duty under the Law proximately caused plaintiffs' injuries. I must, therefore, deny plaintiffs' motion for partial summary judgment. An appropriate order follows.