## DeWitt D. Lewis v. Vermont Gas Corporation

[151 A2d 297]

March Term, 1959.

Present: **Hulburd, C. J., Holden, Shangraw, Barney and Smith, JJ.**

Opinion Filed May 5, 1959.

170

*William C. Sennett* for the defendant.

*John B. Harte* and *O'Neill, Delany & Valente* for the plaintiff.

**Shangraw, J.** This is an action of tort for personal injuries arising out of a propane air gas explosion. Trial was by jury and resulted in a verdict and judgment for the plaintiff. At the close of plaintiff's case the defendant moved for a directed verdict, which motion was renewed at the close of all the evidence. After verdict and before judgment the defendant also moved to set aside the verdict. The defendant was allowed exceptions to the action of the court in denying all three motions. By proceeding with the trial, after the denial of its first motion, the defendant waived its exceptions to the overruling of that motion. *Croteau* v. *Allbee*, 117 Vt 332, 334, 91 A2d 803, and cases cited. Our consideration is therefore confined to the motion for a directed verdict made at the close of all the evidence and the motion to set aside the verdict.

In passing upon the defendant's motions the evidence must be taken in the light most favorable to the plaintiff, and if there is any substantial evidence fairly and reasonably tending to support the plaintiff's claim the question is for the jury. *Wakefield* v. *Levin*, 118 Vt 392, 395, 110 A2d 712. The effect of modifying evidence is to be excluded. Contradictions and contradictory inferences are for the jury to resolve. The tendency of the evidence and not its weight is to be considered. *Campbell* v. *Howard National Bank*, 118 Vt 182, 183, 184, 103 A2d 96; *Fletcher* v. *Manning*, 118 Vt 240, 241-242, 105 A2d 264; *Ready* v. *Peters*, 119 Vt 10, 11-12, 117 A2d 374. The defendant assigns and briefs three grounds of error on the part

of the court in denying its motions: (1) Plaintiff failed to prove any actionable negligence on the part of the defendant; (2) plaintiff had not discharged his burden of proof; and (3) that plaintiff by his own conduct was contributorily negligent, and must be presumed to have assumed the risk.

Viewed in the light most favorable to the plaintiff the evidence fairly and reasonably tended to show the following facts:

The explosion occurred in Bennington, Vermont on August 25, 1955 at the residence occupied by the plaintiff and his family since 1945 or 1946. The property is owned by plaintiff's father and mother. A side-arm gas water heater was installed by the plaintiff's father in 1946 by a private plumber and was being used by the plaintiff at the time of the accident. The defendant acquired the gas distribution system in the Bennington area from the Central Vermont Public Service Corporation in April, 1949, at which time the latter corporation was distributing manufactured water gas. In June of the same year the defendant changed or converted to propane air gas. At the time of the conversion burners on hot water heaters were adjusted and spuds changed if necessary.

Propane is a by-product of gasoline. It is received by the defendant in liquid form, placed in mixers and air added. As delivered by defendant to its customers it is considered a highly inflammable commodity and, when further diluted with air, explosive. Propane air gas being considered an inherently dangerous instrumentality, for detection and precautionary purposes it is also mixed with an unpleasant smelling odorant. Propane gas until mixed with air has a net heating value of about 2360 British Thermal Units per cubic foot at normal temperature and pressure. The propane air gas being furnished the plaintiff at the time of the explosion had a heating value of 750 British Thermal Units, (B.T.U.). Natural gas propane of 750 B.T.U. per cubic foot results in a mixture of 32 per cent propane and about 68 per cent air. This mixture is about 16 or 17 per cent heavier or more dense than air and contrary to popular opinion does not have a tendency to rise. If exposed to air it has a tendency to settle or accumulate in low areas.

On August 25, 1955, in the lighting of a match preparatory to igniting the hot water heater located in the cellar, gas ignited, an explosion occurred and the plaintiff sustained first, second and third degree burns involving the face, the neck, both upper extremeties, his chest, back and portions of the lower extremeties. The house was also damaged particularly on the first floor.

We now refer to details of the installation: the service line, Bristol Recorder, meter, valves, burner, pilot light, thermostat, etc., and the function of each. The defendant maintained a Bristol Recorder on its line located about 500 feet from the plaintiff's premises, which recorded on a circular chart the gas pressure in the service line up to the meter located on plaintiff's premises. The recorder would not reflect any leaks or irregularities beyond the meter. This pressure was constant and normal during the months of July and August, 1955. The pressure on August 25, 1955 was also normal, running from 6.2 to 6.4, varying only one tenth of an inch of water column. The defendant's gas service line entered the cellar leading to a meter. Between the curbing and the meter there was a manual shut-off valve, which, for identification purposes, we shall refer to as a master shut-off valve. This valve was located about three feet from the meter. The defendant admits ownership, control and responsibility of the service line up to and including the meter—but not beyond. The purpose of the meter was to record the number of cubic feet of gas which passed through it. An annual inspection was made by an outside concern of the entire distribution system of the defendant's commercial and residential accounts. Its own service department made an inspection from time to time of its lines. Such inspections, however, were limited up to and including the meter. No inspections were made by the company beyond the meter unless requested. No such specific request was made by the plaintiff. Beyond the meter, on the so-called downstream side, a distance of 16 to 20 feet was a burner to which gas was permitted to flow through a pipe leading from the meter. The burner was attached to a hot water tank and was located near a chimney through which fumes were permitted to escape.

The proper functioning of this burner depended on flame

stabilization. Stabilization occurs when the flow of gas is relatively constant and is entirely consumed by the flame. If the flow rate of gas through the port and into the flame front is increased too greatly what is known as "blow off" will occur and the flame will be extinguished completely by being lifted off the port. If the flow of gas through the burner port and into the flame front is too low a "flash back" occurs and in most cases the flame will go out.

William Paul Jensen, Research Associate at the Massachusetts Institute of Technology, qualified as an expert on propane air gas. This witness was familiar with the type of burner in question and testified as follows:

Q. This blowout which you mentioned with reference to a gas flame, would that be analogous to the flooding of an oil burner pilot light, an excess of oil would have the same effect as excess of gas?

A. I think probably that the clearest understanding can be obtained if we stick to the gas situation, where the flame front can consume the gas if it is fed at a reasonable rate, but if it is fed at a much greater rate the local velocity will be too great, the flame cannot proceed into the fresh gas at the rate required and blowoff will result. On the other extreme, if the flow rate of gas through the burner port and into the flame front is too low, then the flame will tend to reach up toward the burner port and perhaps even into it and what is known as flash back then occurs and in most cases the flame will go out simply because the cooling action of the colder burner walls will quench the flame and if that occurs then the gas which subsequently goes through the burner port doesn't have a chance to burn.

\* \* \*

Q. Now, Mr. Jensen, having in mind that the state of the evidence is to the effect that there was a flame burst in the basement of the plaintiff on August 25, 1955, and the state of the evidence is also to the effect that prior to this burst of flame that there was

gas detected escaping, will you tell us on those facts and based on your education, training and experience as to this type of gas whether you have an opinion as to whether this condition as you just testified could have existed?

A. Yes. I think it could have.

\* \* \*

Q. Now, will you tell us whether or not a meter, displacement meter used to measure the flow of gas being consumed by the burner would have any effect on the flow on the down stream side or the side leading to the burner?

A. If the meter is operating all right it shouldn't have any influence.

Q. But if the meter is malfunctioning, not working properly, would it have any effect?

A. It might conceivably cause a greater than normal pressure drop so the pressure on the downstream side might be less than normal.

Q. Would it have any effect on the operation of the pilot light?

A. If the pressure at the pilot were lower than it should be the flow rate of gas through the pilot would be lower than normal.

The end of the gas line leading from the meter to the hot water heater was connected to a thermostatically controlled shut-off valve by means of a union and after passing through the automatic shut-off valve it was connected by another union to the base of the burner. There was also a hand shut-off valve on the gas line at the base of the burner. Another smaller pipe, ⅛ inch in diameter, was attached to a shut-off valve at the side of the main thermostatically controlled valve. This ran adjacent to and, at some points, parallel with the main feed line to the side of the burner jet for the purpose of a pilot light. The valves, manual or thermostatic, controlling

the flow of gas to the burner had no effect upon the operation of the line leading to the pilot flame. The latter was a direct line and not equipped with an automatic safety pilot control, only a manually operated valve. The thermostatic element controlled the main gas valve on the line leading to the burner. At least a portion of this element entered the hot water tank and by its contact with the water inside the tank, in the rise and fall of the temperature of the water, it actuated the valve inside this unit which opened and closed the entrance and exit of the gas to the burner. Upon inspection after the explosion the heating unit which was immersed in the water tank was found to be thickly coated with a hard substance about an eighth of an inch in thickness, which had the effect of diminishing the heating efficiency of the water heater, acting somewhat as an insulator between the thermostat unit and the water surrounding it.

In the normal operation of this hot water system the pilot light continues to be aflame and lights the burner when gas is called for by the thermostat. As is noted, the pilot line conveying gas to the jet by-passes the line leading to the burner and permits gas to flow to the pilot jet even though the thermostatically or manually controlled valves on the line leading to the burner are closed. The manually controlled valve on the line leading to the pilot jet had no effect on the line leading to the burner whether closed or open. If the pilot valve was open and the flame became extinguished for any reason gas would escape into the cellar. Likewise, if the pilot light was extinguished and gas flowed to the unlighted burner gas would escape into the atmosphere. Escaping gas from the pilot light or the burner would dissipate into the atmosphere in the basement and would settle over the lower regions of the cellar. The amount of concentration would depend upon the volume or amount of gas which had escaped. It is obvious that there was a sufficient amount to have caused the explosion.

By reason of plaintiff's absence from home on five or ten occasions from 1946 to June, 1955, plaintiff had turned off the gas heater and relighted it upon his return. On two or three occasions during the year preceding the explosion he had heard gas escaping and each time had shut off this appliance.

This fact was not reported to the defendant. Plaintiff had experienced difficulty with the hot water heater and had made complaints to a Mrs. Florence Fonteneau, clerk of the defendant on at least two occasions about the amount of the bills and lack of hot water. Plaintiff testified on cross-examination that he called on Mrs. Fonteneau in June, 1955, stating: "I complained that gas did not seem to be functioning 100%, why was there a variance in my bills. I think she inquired if I was having trouble and I probably said 'not in particular'. " Plaintiff again testified that he made another complaint in July, 1955 to Mrs. Fonteneau and on direct examination of Dr. Lewis the following question was asked and answer given:

Q. Doctor, the difficulty to which you were about to testify, will you tell whether or not you communicated that to the defendant?

A. At the time I was paying a bill I did make a complaint as to the fact that there was a variance in my bills. I wanted to know why. Also I believe I complained as to the fact the heater was not functioning properly. In other words they asked me what I believed to be the difficulty and I wasn't sure,

Again referring to the complaint made to Mrs. Fonteneau in July, 1956, on cross-examination the following questions were asked of Dr. Lewis and answers given:

Q. What did you say to her?

A. I asked her if they were going to do anything about it and very shortly afterward they did.

Q. Do anything about what? About your bill did you mean?

A. Bill or whether they were going to check it or anything of that nature. That's the way I felt.

Q. Check the meter or check your account?

A. Check the meter or check anything.

Q. What did she tell you then in response?

A. I think she said "We will see about it."

On being improved as a witness by the defendant, Mrs. Fonteneau admitted that plaintiff had complained to her about the variation in his bills, denying, however, any conversation about the gas service or the functioning of the gas water heater or of the service line leading to plaintiff's gas water heater.

Gwendolyn Lewis, plaintiff's wife, testified that two meters were installed on July 16, 1955. After installing the first meter she testified that she telephoned Mr. Frank Prideaux and told him that * * * "I wasn't getting any hot water" * * * "I wanted to do a washing." Mr. Prideaux, vice president of the defendant, and in charge of operations denied having had any conversation with Mrs. Lewis. Mrs. Lewis also testified that after the second meter was installed on the same day she talked to defendant's service man who said * * * "that had been the trouble with the meters they had put in and he said, 'It is O. K. now'. " Mr. Bruce Griffith, service man of the defendant, testified that at the time of the installation of the new meter he checked the pipes leading to the meter and found no leaks. He also checked the meter connections. He did not check the pipes from the meter to the water heater, nor did he inspect the gas appliance. On July 19th, 1955 at the request of the plaintiff another employee of the defendant, Emery Limoges, lighted the burner but did not inspect the gas or water appliances. Mrs. Lewis also testified that on August 24, 1955, Warren Hart, representing the defendant, called and read the meter and that after reading the meter * * * "He came upstairs and said there hadn't been any change in the reading from the month before and he would report it immediately to the company." After the new meter was installed heating of the water was slower. From July 16th to the date of the explosion plaintiff experienced no major difficulties although the water did not heat adequately. No further complaint was made by the plaintiff to the defendant. At no time had the plaintiff been cautioned by the defendant about the danger of propane air gas. In accounting for the shortage of hot water on August 25th and the fact that the pilot light went out, plaintiff expressed the opinion that it was because the gas influx was irregular and improper.

Prior to the explosion the plaintiff had been absent from his home a week in August, 1955, and before leaving, as he testified, "I turned the gas off." Plaintiff returned home on Sunday and turned the gas back on. The accident occurred on Thursday of the same week. In the afternoon of August 25, 1955, about 4:30, the plaintiff entered his cellar and noticed that the pilot light was out. He turned off the gas and opened two windows in the cellar. At the time he noticed that the gas had not ignited and was flowing—going up the flue—up the chimney—could hear it. Plaintiff was under the impression there was an odor of gas. He stated that under normal circumstances the escaping gas would have gone up the chimney and not become dispersed in the cellar. After turning off the gas Dr. Lewis went upstairs, later had his supper and returned about 7:00 p.m. This time plaintiff did not detect the odor of propane air gas and, without making any adjustments on the hot water burner, lighted a match preparatory to turning on the gas and igniting the burner. The explosion followed immediately and as testified to by the plaintiff * * * "It was just a roar of flame." * * * "As far as I can say I was in the middle of it." Again the plaintiff testified that the flame * * * "appeared to be all over the cellar." * * * "It moved from all directions."

Francis D. Walker, fire chief, was the first person to enter plaintiff's cellar shortly after the explosion and observed that * * * the burner was out and that it was in an 'on' position." He then shut off the valve. Frank Prideaux, vice president of the defendant, arrived at the house between 7:15 p.m. and 7:30 p.m., and inspected the premises and found no defects in the line leading from the curb up to and including the meter. No evidence of escaping gas was found. His inspection disclosed no defects in the meter. He expressed the opinion that the cause of the explosion was propane air gas, however he was unable to determine the area from which the gas escaped into the cellar. Deputy State Fire Marshall Chester M. Kirby arrived later in the evening and made an investigation. He testified that escaping gas from the pilot light, if not burning, nor the valve shut off, would first go toward the floor and accumulate in the cellar. In such event

its concentration would depend upon the volume or amount of gas that was going through the pilot feed. Mr. Kirby expressed the opinion that if tests were made by the company only for leaks on the upstream side of the meter that it would not be an adequate safety measure.

■ At the close of all the evidence the defendant moved for a directed verdict on several grounds. The defendant in its brief treats the questions presented in three parts. Point I. That plaintiff has failed to prove actionable negligence on the part of the defendant. Point II. Plaintiff has not discharged his burden of proof. Point III. Plaintiff by his own conduct was contributorily negligent and assumed the risk. Points I and II are considered together. In referring to Points I and II, it is the well established law in this state that the burden of showing defendant guilty of some act or omission that proximately caused the accident was on the plaintiff. *Longchamp* v. *Conti*, 115 Vt 492, 493, 66 A2d 1; *Peterson* v. *Post*, 119 Vt 445, 450, 128 A2d 668.

■■ In considering the motion for a directed verdict, while the tendency of the evidence and not its weight is to be considered, the question is not merely whether there is any evidence to this effect, but whether it is of such a quality and character as to justify a jury, acting reasonably, to predicate a verdict thereon in favor of the party having the burden of proof. *Peterson* v. *Post*, 119 Vt 445, 451, 128 A2d 668. Evidence which merely makes it possible for the fact in issue to be as alleged, or which raises a mere conjecture, surmise or suspicion, is an insufficient foundation for a verdict. *Perkins* v. *Vermont Hydro-Electric Corp.*, 106 Vt 367, 399, 177 A 631, and cases cited. The form of expression used in some of our cases is that there must be substantial evidence fairly and reasonably tending to support the plaintiff's claim to make a case for the jury. *Wellman, Admr.* v. *Wales*, 98 Vt 437, 447, 129 A 317; *Ready* v. *Peters*, 119 Vt 10, 11, 117 A2d 374; *McKirryher* v. *Yager*, 112 Vt 336, 346-347, 24 A2d 331.

To a large extent this case centers around the nature of the complaints made by Mr. and Mrs. Lewis to the defendant and its failure to act thereon. While at no time did either

Mr. or Mrs. Lewis specifically ask that the line and appliance be inspected, however their complaints were of such nature and character as to apprise the defendant that something was wrong. In view of the dangerous properties of propane air gas a duty devolved upon the defendant to make an examination. Despite defendant's evidence to the effect that no defect was found in the meter after the explosion, it was within the province of the jury to infer from the testimony of Mr. and Mrs. Lewis that the meter was malfunctioning and that the defendant knew or should have known this. There appears no evidence that there were any defects in the privately owned service line or equipment, nor does it appear that any defects existed in the defendant's service line from the curb leading into plaintiff's residence and up to the meter. It is obvious that either the pilot light became extinguished and gas thereby escaped through the pilot jet, or that gas escaped through the burner which did not ignite, or both. The meter is the focal point. The jury was entitled to regard the evidence of the non-recording of the meter as a danger signal, and of this the defendant had notice.

In addition to the quoted testimony of Mr. Jensen, on cross-examination of Mr. Lewis the following questions were asked and answers given:

Q. In connection with No. 18 you were asked what your opinion was as to the cause of your home being without hot water on August 25, 1955, and your answer shows that you considered it was on account of the gas influx was irregular and improper, is that still your opinion and your answer?

A. Yes.

Q. In other words, is it your opinion that the pilot light may have become extinguished from time to time on account of the gas influx being irregular and improper?

A. Yes.

Q. Do you have an opinion as to what may have caused the pilot light of your gas water heater to become

extinguished sometime during the day of August 25 prior to 4:30 when you turned it off?

A. Yes.

Q. What is that opinion?

A. I believe it just went out.

Q. You consider that as having happened on account of the gas pressure or influx being irregular and improper?

A. That is right.

Q. Is that the only basis for your opinion?

A. Yes.

The above quoted testimony, together with that of Mr. Jensen, presented an issue for the jury as to the effect of any irregularity of gas influx.

■ The defendant claims that the plaintiff's wife's testimony should be rejected and ignored as no evidence worthy of consideration. This position is not well taken. Testimony which is not impossible, though it may be unreasonable, inconsistent or contradictory is for the jury's consideration. *Shields* v. *Vt. Mutual Fire Ins. Co.,* 102 Vt 224, 237, 147 A 352; *Robey* v. *B. & M. R. R.,* 91 Vt 386, 388, 100 A 925.

It is also urged by the defendant that the jury must have inferred that from the purported failure of the meter to record it was defective and that such defect caused a substantial variance in the pressure leading down stream from the meter; and inferred further that the inferred pressure variation extinguished the pilot light. The defendant maintains that a trier of fact may not legitimately find a fact by inferring its existence from another fact which has itself been found as a result of an inference, and cites *Gero* v. *John Hancock Mutual Life Ins. Co.,* 111 Vt 462, 18 A2d 154. In that case this court made the following statement at page 480 of the opinion: "But a given state of facts proven to the satisfaction of the jury may give rise to two or even more separate inferences, and in such a case one inference is not built upon the other, each is drawn independently from the same evidence." We

have in this case, independent of inferences, testimony as to the non-recording of the meter, its effect upon the gas pressure leading to the hot water heater, and the result upon the pilot light. The record does not support defendant's contention.

■■■ Defendant concedes ownership of the meter and the responsibility for its inspection and maintenance. Propane air gas is an inherently dangerous substance. Well considered cases take the view that those who distribute a dangerous article or agent owe a degree of protection to the public proportionate to and commensurate with the dangers involved. *McAffee* v. *Travis Gas Corporation*, 137 Texas 314, 153 SW2d 442. See annotation, 26 ALR2d, page 146 and cases cited. Stated differently, it has been held that a company which produces and furnishes gas is bound to use such skill and diligence in its operations as is proportionate to the delicacy, difficulty and nature of the particular business. *Atlanta Gas Light Co.* v. *Johnson*, 76 Ga App 413, 416, 46 SE2d 191. As to its lines, a gas company is not an insurer, but if the gas company fails to exercise care and injury results therefrom, it is liable. 24 Am Jur, Gas Companies, §22, pages 681, 682, and cases cited. In using the degree of care to prevent damage commensurate to the danger which it is its duty to avoid, generally this requires an efficient system of inspection, oversight and superintendence of its lines and equipment. 38 CJS, Gas, §42 (b), page 733. Notice or knowledge of defects in pipes, etc., will be presumed where the circumstances are such that the company, by the exercise of proper and reasonable diligence might have known of the defect which caused the damage complained of. 38 CJS, Gas, §42 (c) p. 735 and cases cited. The duty of proper installation, maintenance and inspection of a meter furnished, owned and exclusively controlled by a public service corporation engaged in supplying natural gas, and all of the fittings by which it is attached to the service pipe, rests upon the corporation. Negligence, consisting of omission of such duty, and causing injury, imposes liability upon it. Such is the holding in *Helm* v. *Manufacturers Light & Heat Co.*, 86 W Va 628, 104 SE 59, 25 ALR 240. See annotation, 26 ALR2d, page 180 and cases cited.

 A gas company generally is under no duty to keep in repair or inspect lines and appliances owned privately, and is not thereby chargeable with defects and results unless it has notice of such defects. 38 CJS, Gas, §42 (d), pages 735, 736; 24 Am Jur, Gas Companies, §32, page 686. As to conditions arising from defects in the lines of customers, the responsibilities of the gas company are different from those where the company owns the pipe, etc., for there it is the duty of the consumer to see that his lines and equipment are maintained in serviceable condition. However, the company knows that it is dealing with a dangerous agency, and if it knows, or should have known, that the consumer's lines and equipment are unsafe, it is its duty to require the lines to be repaired or else to shut off the gas at the curb. *Stephany* v. *Equitable Gas Co.*, 347 Pa 110, 31 A2d 523; *Holsclaw's Admr.* v. *Louisville Gas & Electric Co.*, 267 Ky 56, 100 SW2d 805. See annotations 17 ALR2d 891; 26 ALR2d 150, 162 and 138 ALR 879.

It was for the jury to say whether defendant's conduct met the standard of care required of it under the circumstances. It is evident that there was sufficient evidence upon which the jury, acting reasonably, could have found the defendant negligent and that such negligence was a proximate cause of the explosion.

 The remaining grounds set forth in the motion and briefed are that plaintiff by his own conduct was contributorily negligent and that he assumed the risk. In *Roberts* v. *Gray*, 119 Vt 153, at page 157, 122 A2d at 858, this court said: "It is not negligence to fail to take precautionary measures to prevent accidents or injuries resulting from a peculiar, unusual and unexpected occurrence which could not have been reasonably anticipated. 65 CJS 592. For cases with holdings to the same effect see *Botticelli* v. *Winters*, 125 Conn 537, 7 A2d 443, 445, and *Prue* v. *Goodrich Oil Co.*, 49 RI 120, 140 A 665." The true test is what would a careful and prudent person have done in like circumstances, acting on his judgment then, and not on a judgment based on subsequent reflection. *Sharby* v. *Town of Fletcher*, 98 Vt 273, 281, 127 A 300. For a case much in point with that here see *Atlanta Gas Light Co.* v. *Johnson*, 76 Ga App 413, 46 SE2d 191.

■■■ As to assumption of risk this doctrine has no application unless there was knowledge, express or implied, of the existence of the risk, together with an appreciation of the extent of the danger. One cannot assume a risk unless one knows about it, appreciates it and consents to assume it. If one, knowing and comprehending the danger, voluntarily exposes himself to it, even though not negligent in so doing, he is deemed to have assumed the risk and is precluded from recovery for an injury resulting therefrom. *Roberts* v. *Gray, supra,* 119 Vt at 157, 122 A2d 855; *Painter* v. *Nichols,* 118 Vt 306, 310, 108 A2d 384; *Bouchard* v. *Sicard,* 113 Vt 429, 431, 35 A2d 439. Reverting to the evidence, Mr. Lewis testified that when in the cellar about 4:30 p.m. the jet pilot light was out and he heard gas escaping up the vent into the chimney. He was under the impression that he smelled an odor, turned off the gas and opened up two windows. Later, about seven o'clock, upon returning to the cellar he then failed to smell any gas and thereafter lighted a match preparatory to igniting the heater. The explosion resulted. There is no evidence that plaintiff had any special knowledge of the dangerous qualities of propane air gas or that he was cognizant of the fact that the gas in question was heavier than air and had a tendency to settle in the basement rather than escape through the windows. It was for the jury to say whether he had a right to assume that opening of the windows had permitted the gas to escape, particularly having in mind that he did not detect the odor of gas on his second trip to the cellar. It cannot be said, as a matter of law, that he was negligent in attempting to ignite the heater or that he assumed the risk.

There was no error on the part of the trial court in denying defendant's motion for a directed verdict. What we have said on the motion for a directed verdict disposes of the exceptions to the denial of the motion to set aside the verdict. There was substantial evidence to support the verdict and, therefore, error is not made to appear.

*Judgment affirmed.*