632 A.2d 492

**Susie J. DUDLEY,**

**v.**

**BALTIMORE GAS & ELECTRIC COMPANY.**

**No. 264, Sept. Term, 1993.**

Court of Special Appeals of Maryland.

Nov. 3, 1993.

Robert A. Suls (Michael B. Mann and Mann & Whelley, P.A., on the brief), Towson, for appellant.

Kerry B. Fisher (Stephen J. Rosasco, on the brief), Baltimore, for appellee.

Argued before GARRITY, BLOOM and MOTZ, JJ.

MOTZ, Judge.

This case involves the liability, vel non, of a gas company to one of its customers for damages resulting from an unexplained fire in the customer's home.

Appellant, Susie J. Dudley, appeals from the entry of summary judgment against her and in favor of appellee, Baltimore Gas & Electric Company (BG & E), by the Circuit Court for Baltimore City (Ward, J.). Until March 18, 1989, Ms. Dudley resided at 4300 Fairview Avenue in Baltimore City; since 1963, she had purchased gas from BG & E. Ms. Dudley left her home on the afternoon of March 18, 1989. When she returned that evening her home had been totally demolished by fire.

On April 4, 1991, Ms. Dudley filed a five-count complaint against BG & E in the circuit court. She alleged that BG & E was negligent in "failing to properly select, maintain, test and

inspect its meter box, gas piping and appurtenances ... and in failing to warn [her] of the dangerous condition of same" (Count 1); that BG & E was strictly liable to her because it provided "gas piping, a meter box and natural gas which were defective and in an unreasonably dangerous condition in that the gas was flammable and highly explosive and the pipes, appurtenances and meter box were faulty, deteriorated and subject to leaking (Count 2); that BG & E breached its implied warranty to deliver gas in a safe and effective manner (Count 3); that BG & E breached its contract to supply her with gas in a safe and effective manner (Count 4); and finally that BG & E's placement "within its land, property and piping system highly volatile and explosive natural gas" subjected it to "liability without fault" (Count 5).

BG & E answered the complaint and the parties engaged in discovery for a number of months. Ms. Dudley conceded in deposition that prior to March 18, 1989, she never had any problems with natural gas leaks in her home, never smelled the odor of natural gas in or around her house, never notified BG & E of any gas leaks in or around her house, did not know of any neighbors who had notified BG & E of any gas leaks in the area of her house, and did not recall ever observing BG & E employees working in the area around her house. BG & E's corporate designee testified in his deposition that BG & E records indicated "no calls for gas leaks at any of the homes of the 4300 block of Fairview Avenue were received" at any time during the week before the explosion. Another BG & E official confirmed that BG & E records for a "five year period" prior to the accident indicate BG & E "has no record of a call for a gas leak at any of the houses in the 4300 block of Fairview Avenue prior to the March 18, 1989 occurrence at issue." The Baltimore City Fire Department's fire investigation report stated that the first officer on the scene found "heavy blue flames from the front of the basement and the walls were already down" and that "it is the opinion of this investigator there was a natural gas leak in the area of the gas meter, which over a period of time built up in the basement ceiling and upper regions of the house." The report of a BG

& E customer service supervisor stated that after the fire a test "on the existing service and metal installation . . . indicated a slight gas leak." Other facts are set forth within as necessary.

On November 4, 1992, BG & E moved for summary judgment; Ms. Dudley opposed the motion. On December 28, 1992, the circuit court issued an order granting the motion. Ms. Dudley raises five questions on appeal, one paralleling each of the five counts of her complaint:

1. Did the trial court err in granting summary judgment to the defendant on plaintiff's claims that BG & E had been negligent when there were sufficient facts presented from which the jury could reasonably conclude that BG & E failed to properly select, maintain, test and inspect its meter box, gas piping and appurtenances and failed to warn Dudley of the dangerous conditions of these components?

2. Did the trial court err in granting summary judgment to the defendant on plaintiff's claims that BG & E should be held strictly liable when there were sufficient facts presented from which the jury could reasonably conclude that BG & E furnished defective and unreasonably dangerous gas piping, meter box and natural gas which items were defective at the time they left the possession and control of BG & E?

3. Did the trial court err in granting summary judgment to the defendant on plaintiff's claims that BG & E breached its warranty when there were sufficient facts presented from which the jury could reasonably conclude that BG & E failed to deliver gas in a safe and effective manner so as not to damage the plaintiff's property?

4. Did the trial court err in granting summary judgment to the defendant on plaintiff's claims that BG & E breached its contract when there were sufficient facts presented from which the jury could reasonably conclude that BG & E failed to supply Dudley with natural gas in a

safe and effective manner so as not to damage her property?

5. Did the trial court err in granting summary judgment to the defendant on plaintiff's claims that BG & E should be held liable without regard to fault when there were sufficient facts presented from which the jury could reasonably conclude that BG & E placed within its land, property and piping system highly volatile and explosive natural gas, permitted the artificial accumulation of natural gas within its property which escaped into the plaintiff's property causing an explosion and destroying Dudley's home and personal property?

The circuit court did not issue an oral or written opinion in granting the summary judgment motion. Rather, its order stated in its entirety:

Upon consideration of Defendant Baltimore Gas and Electric Company's Motion for Summary Judgment, and any response filed thereto, it is this *28* day of *December*, 1992

ORDERED, by the Circuit Court for Baltimore City, that said Motion for Summary Judgment regarding the Plaintiff's Complaint is hereby GRANTED.

Costs assessed to plaintiff.

Although it would be preferable to have the benefit of the circuit court's rationale as to why summary judgment was proper here, in the absence of any such explanation, "we must assume that the circuit court carefully considered all of the asserted grounds and determined that all or at least enough of them as to merit the grant of summary judgment were meritorious." *Bond v. NIBCO, Inc.*, 96 Md.App. 127, 133, 623 A.2d 731 (1993). In reviewing a lower court's grant of summary judgment, we determine whether the lower court was "legally correct." *Beatty v. Trailmaster Products, Inc.*, 330 Md. 726, 737, 625 A.2d 1005 (1993); *Heat & Power Corp. v. Air Prods. & Chems.*, 320 Md. 584, 592, 578 A.2d 1202 (1990).

(i)

Ms. Dudley's first and principal contention is that the circuit court "erred in concluding as a matter of law that there was insufficient evidence presented to raise a jury issue on [her] negligence claim."

BG & E asserts that because it had no notice of a gas leak in Ms. Dudley's house, under Maryland law, it has no liability to her for damage caused by the leak. There is no recent Maryland case involving the liability of a utility in a similar situation. Three early Court of Appeals cases, however, assertedly provide the basis for BG & E's argument. In the first, *Consolidated Gas Co. v. Crocker,* 82 Md. 113, 33 A. 423 (1895), the Court found that a gas company was negligent when it had been given notice of a gas leak and failed to resolve the problem. The *Crocker* court reasoned:

> When a gas company is made aware, as in this case, that large quantities of gas are escaping into a building, it becomes its plain duty to use reasonable diligence to discover and to stop the leak. It cannot discharge that duty by assuming without knowing that the leak proceeds from one source, when, in fact, it proceeds from a totally different source which could have been discovered by proper inspection. *This rule requires nothing unreasonable—it does not require that the company shall keep up a constant inspection all along its lines, without reference to the existence or non-existence of a probable cause for the occurrence of leaks or escapes of gas*—but it does require that when notice of the existence of a leak has been given to a company, the company shall use reasonable care to discover the cause of the leak and appropriate means to remedy it.

*Id.* at 124, 33 A. 423 (emphasis added). Two years later in *Brady v. Consolidated Gas Co.,* 85 Md. 637, 37 A. 263 (1897), the Court used the *Crocker* dicta as the basis for holding that a gas company was not negligent as a matter of law when it was not given notice of a gas leak.

> It was not negligence on the part of the company to leave its pipes on the premises, nor does the fact that it made no

examination of the pipes raise any presumption of negligence, in the absence of any notice of the existence of any cause for an examination. Had there been such notice its duty would have been to have discovered the cause of the leak, and to have used proper means to remedy it. It was not required to keep up a constant inspection all along its lines, without reference to the existence or non-existence of a probable cause for the occurrence of leaks, or escape of gas.

*Id.* at 642, 37 A. 263. *See also Consolidated Gas Co. v. Connor,* 114 Md. 140, 151–52, 78 A. 725 (1910) (when gas company was notified of a gas leak three or four days before inhalation of gas injured plaintiffs, sufficient evidence to show negligence on part of gas company).

■ Contrary to BG & E's vigorous assertions, we do not believe that under Maryland law a plaintiff can recover against a gas supplier on a negligence theory only if the supplier had actual notice of a leak and failed to remedy the situation. Indeed, the language, if not the holdings, of the very cases upon which BG & E so heavily relies is to the contrary. For example, although the *Crocker* court held that it was "not called on to go farther or to lay down a broader rule than this in the pending case," *id.* at 125, 33 A. 423, it noted that a "system of inspection should be maintained as would insure reasonable promptness in the detection of all leaks that might occur from the deterioration of the material of the pipes, or from any other cause within the circumspection of men of ordinary skill in the business." *Crocker,* 82 Md. at 123, 33 A. 423 (quoting *Koelsch v. Philadelphia Co.,* 152 Pa. 355, 25 A. 522 (1893)).

■ Similarly, in *Connor,* the Court of Appeals noted that: The substance which the [gas company] manufactures and delivers to its consumers through its system of mains and connections is highly dangerous to persons and property, and the duty of the company is to use all reasonable precautions to confine this agency within the channels where it may be employed with safety and utility.

*Connor,* 114 Md. at 154, 78 A. 725. The *Connor* court also quoted with approval a case holding that "the [gas] company . . . owed a duty to all persons who might be injured by the gas to use ordinary and adequate care in delivering the substance into the residence in question." *Id.* at 155, 78 A. 725 (quoting *Richmond Gas Co. v. Baker,* 146 Ind. 600, 45 N.E. 1049 (1897)). In sum, although the Court of Appeals has to date not directly addressed precisely a claim like that in the case at hand, the language in its cases clearly suggests that a supplier of natural gas has a duty to act reasonably in supplying natural gas to its customers. Therefore, a supplier could be charged with constructive notice if it failed to act reasonably in detecting a leak.

In reaching this conclusion, we note that, although ignored for the most part by the parties, there is a wealth of more recent out-of-state law supplementing the *Crocker, Brady,* and *Connor* decisions. Courts across the country impose upon gas companies an obligation to act with reasonable care in the delivery of their services. *See, e.g., Auriemme v. Bridgeport Gas. Co.,* 144 A.2d 701, 702, 144 A.2d 701 (Conn.Super.Ct.1958); *Pappas v. Peoples Gas Light & Coke Co.,* 350 Ill.App. 541, 113 N.E.2d 585, 589 (1953). Variously articulated as due care, great care, or high degree of care, the standard is that of ordinary care given the dangerous propensities of gas. *See, e.g., Herbst v. Northern States Power Co.,* 432 N.W.2d 463, 467 (Minn.Ct.App.1988) (finding that a gas company had "a high duty of care, proportionate to the great danger associated with maintaining a gas transmission pipeline"); *Karle v. National Fuel Gas Distrib. Corp.,* 448 F.Supp. 753, 759 (W.D.Pa.1978); *Fields v. Western Kentucky Gas Co.,* 478 S.W.2d 20, 22 (Ky.1972); *Lewis v. Vermont Gas Corp.,* 121 Vt. 168, 151 A.2d 297, 306 (1959); *Everly v. Columbia Gas of West Virginia,* 171 W.Va. 534, 301 S.E.2d 165, 168 (1982); *see also* 38 C.J.S. *Gas* § 42a (1943 & 1993 Cum.Supp.). Certainly once a gas company has notice of defects in gas lines or even in a customer's appliances, it has a duty to repair the defects or shut off the gas. *Reed v. Smith Lumber Co.,* 165 W.Va. 415, 268 S.E.2d 70, 72 (1980).

Although actual knowledge of a problem, such as the smell of gas or prior repairs in the same section of pipe, may require a gas company to take additional action in order to act reasonably, the duty to exercise ordinary care exists at all times in the delivery of gas. *Karle,* 448 F.Supp. at 759. Absent actual notice, for example, a gas company must still use reasonable care in the inspection and maintenance of its lines. *Id.* at 759, 762; *Fields,* 478 S.W.2d at 23 (stating that gas company has "the duty of reasonable inspection and maintenance according to the circumstances of the particular case"); *Pioneer Natural Gas Co. v. K & M Paving Co.,* 374 S.W.2d 214, 218 (Tex.1963); *Lewis,* 151 A.2d at 306. There must, however, be a showing that the gas company knew or should have known that there was a problem with its equipment. *Carlile–Doughty Corp. v. Philadelphia Elec. Co.,* 210 Pa.Super. 117, 232 A.2d 631, 633 (1967). *See also* L.S. Tellier, Annotation, *Liability of Gas Company for Injury or Damage Due to Defects in Service Lines on Consumer's Premises,* 26 A.L.R.2d 136 (1952); B. Finberg, Annotation, *Liability of Gas Company for Personal Injury or Property Damage Caused by Gas Escaping from mains in Street,* 96 A.L.R.2d 1007 (1964); and 38 C.J.S. *Gas* §§ 38, 40–42 (1943 & 1993 Cum.Supp.) for further discussion of gas companies' liability for harm caused by escaping gas.

Finally, some courts have held that compliance with relevant State and federal statutes and regulations may be considered in determining whether a gas company has acted reasonably. For example, it has been held that there was sufficient evidence to uphold a jury's finding that the defendant gas company had made a thorough inspection to discover leaks when it followed federal mandates as to the method of inspection and, in fact, inspected more frequently than required. *See Gray v. Enserch, Inc.,* 665 S.W.2d 601, 604 (Tex.Ct.App. 1984); *see also Kearney v. Kansas Pub. Serv. Co.,* 233 Kan. 492, 665 P.2d 757, 766 (1983) (holding that trial court was correct to exclude evidence of gas company's compliance with state and federal regulations, including those promulgated under the Natural Gas Pipeline Safety Act, where there was

no showing of which sections were complied with and that they were relevant to the alleged negligence). With these principles in mind, we turn to the specific claims of negligence made by Ms. Dudley.

Her first argument is based on alleged violations of the Natural Gas Pipeline Safety Act (the "Act"). The Act authorizes and requires the Secretary of Transportation to "establish minimum Federal safety standards for the transportation of gas and pipeline facilities. Such standards may apply to the design, installation, inspection, emergency plans and procedures, testing, construction, extension, operation, replacement, and maintenance of pipeline facilities." 49 U.S.C.App. § 1672(a) (1988). Pursuant to this authority, the Secretary promulgated 49 C.F.R. § 192.457, which establishes "external corrosion control" standards for pipelines that, like those at issue here, were installed before August 1, 1971. That regulation states, *inter alia,*

(b) Except for cast iron or ductile iron, each of the following buried or submerged pipelines installed before August 1, 1971, must be cathodically protected in accordance with this subpart *in areas in which active corrosion is found:*

(1) Bare or ineffectively coated transmission lines.

(2) Bare or coated pipes at compressor, regulator, and measuring stations.

(3) Bare or coated distribution lines. The operator shall determine the areas of active corrosion by electrical survey, or where electrical survey is impractical, *by the study of corrosion and leak history records, by leak detection survey,* or by other means.

(c) For the purpose of this subpart, active corrosion means continuing corrosion which, unless controlled, could result in a condition that is detrimental to public safety.

49 C.F.R. § 192.457 (1992) (emphasis added). Ms. Dudley asserts that BG & E was negligent in failing to inspect for areas of "active corrosion" in order to determine whether cathodically protected piping was required. The federal regu-

lation requires that cathodically protected piping be used "in areas in which active corrosion is found." *Id.* Areas of active corrosion may be detected, *inter alia,* "by the study of corrosion and leak history records, by leak detection survey, or by other means." *Id.*

˙In uncontroverted deposition testimony, BG & E's corporate designees explained the pipeline inspection procedures undertaken by BG & E to ascertain corrosion:

Q. Let's move on with these enumerated questions so we can follow the script for a while. Number 16, did you make regular inspections of the mains, service pipes, connections, or valves prior to March 18, 1989?

[A]. Yes.

Q. Can you tell me how frequently you made inspection of the main, service pipes, valves and other connections?

[A]. *Our records indicate that leak surveys were conducted on January 4, 1977, November 16, 1982, October 26th, 1985, and again on March 22, 1988.*

Q. What was the thrust of these leak surveys, what was done?

\* \* \* \* \* \*

[A]. The main and services were leak surveyed using hydrogen flame ionization equipment *as required by federal law.*

Q. Can you describe that procedure for us ...?

[A]. The main is driven over with a very sensitive instrument that will pick up gas in parts per million, the service lines are walked over with a similar hand-held instrument to pick up leaking gas at the rate of 50 parts per million. The mains and services were surveyed in 1988 and no leakage was found. They are surveyed every three years as [required by] DOT standards.

Q. Is there—are you telling me that all of these mains and specifically that the Dudley service pipe was in fact surveyed in 1988?

[A]. Yes, it was.

(emphasis added).

Thus, it is undisputed that BG & E conducted a "leak detection survey." It is also, as noted above, undisputed that there was no leak history for the Dudley residence, nor for any buildings in the area of that residence. Accordingly, the uncontroverted testimony is that BG & E˙has complied with the federal regulation by determining where active corrosion exists by use of "leak history reports," and a "leak detection survey." Of course, as Ms. Dudley asserts, compliance with statutory requirements will not prevent a finding of negligence where a reasonable person would take additional precautions. *Leonard v. Sav–A–Stop Servs.*, 289 Md. 204, 212, 424 A.2d 336 (1981). *Cf. Honolulu Ltd. v. Cain*, 244 Md. 590, 598, 224 A.2d 433 (1966) (conformity to industry standards is not conclusive of non-negligence). The uncontroverted evidence here, however, suggests no reason why a reasonable person in BG & E's position should have taken additional precautions to determine where active corrosion exists. Of course, the whole discussion of underground pipe leak detection is a bit of a red herring. There is no suggestion that the fire/explosion originated with an underground leak—Ms. Dudley had to rely on a theory that the leak was at the meter—inside the house—not in an area of corrosion.

█ Ms. Dudley further argues that summary judgment with regard to the negligence count was error because "material facts ... are in dispute [that] relate to BG & E's policies which required their meters to be replaced every 14 years." Ms. Dudley, in affidavit, testified that her gas meter was never replaced from 1963 to March 18, 1989. A BG & E employee asserted in affidavit, which was substantiated by attached company records, that the meter in Ms. Dudley's house at the time of the fire, has been "taken from 247 St. Helena Avenue to BG & E's meter shop on December 11, 1967 where it was tested and then installed at [Ms. Dudley's] address on January 17, 1968." Ms. Dudley asserts that this factual dispute is a material one precluding summary judgment. A material fact

is one that will in some way affect the outcome of the case. *King v. Bankerd,* 303 Md. 98, 111, 492 A.2d 608 (1985). "A dispute as to a fact 'relating to grounds upon which the decision is not rested is not a dispute with respect to a material fact and such dispute does not prevent the entry of summary judgment.' " *Seaboard Surety Co. v. Kline, Inc.,* 91 Md.App. 236, 242–43, 603 A.2d 1357 (1992) (quoting *Salisbury Beauty Schools v. State Bd. of Cosmetologists,* 268 Md. 32, 40, 300 A.2d 367 (1973)).

There is surely a factual dispute here. It is, however, not material for two reasons. First, the regulation assertedly violated here was designed not to protect consumers but to assure the accuracy of the meters; and second, there is no legal requirement that every gas meter be replaced, or even tested, every 14 years. The regulations on which Ms. Dudley relies provide, in pertinent part:

**.07 Periodic Test Program**

A. Periodic Test Requirements. Each utility shall periodically test its meters, associated devices, and instruments *to assure their accuracy,* unless otherwise authorized or required by the Commmission.....

B. *Election.* Utilities may elect to test all meters in each group in accordance with the Periodic Test Program *or in accordance with the In–Service Performance Test Program (Regulation .08)*

\*　　\*　　\*　　\*　　\*　　\*

D. Meter Schedule

(1) Group I meters shall be tested at least once in 14 years.

\*　　\*　　\*　　\*　　\*　　\*

**.08 In–Service Performance Test Program.**

A. The Commission's *in-service performance test program is designed to automatically adjust the number of meters required to be tested by a utility based solely on the performance of the utility's meters.*

\*　　\*　　\*　　\*　　\*　　\*

C. In–Service Performance Test Schedule

(1) Group 1 Meters. The *percentage of the total number of in-service Group I meters* required to be tested will be determined by the following formula:

$M = 2.5 - 0.25 (100-OK)$ for values of OK between 75 and 100.

$M = 0.35 (100-OK)$ for values of OK below 75.

Where M = Percentage of meters required to be tested.

20.55.07.08 Public Service Commission

OK = Percentage of meters tested during last calendar year with proof between 98 and 102 at check flow.

COMAR 20.55.07.07 and 20.55.07.08 (emphasis added). Thus, the stated purpose of the Periodic Test Program was to "assure" the "accuracy" of the "meters" and "associated devices," not their safety. See COMAR 20.55.07.07.

Moreover, a BG & E representative provided sworn, uncontroverted, testimony that the company elected to test meters in accordance with the In–Service Performance Test Program. (Contrary to Ms. Dudley's claims, the BG & E employee who stated that Ms. Dudley's meter had been replaced in 1968 did not state that BG & E had elected the Periodic Test Program.) The In Service Performance Test Program, unlike the Periodic Test Program, does not require that BG & E replace every meter at least once every 14 years. Rather, the In Service Performance Test Program provides a formula by which BG & E is to determine how many meters within a specified grouping must be tested; those, and only those, meters are then selected at random while in service and tested. COMAR 20.55.07.08. For these reasons then, the question of whether BG & E has replaced Ms. Dudley's meter in the last 14 years, or ever, is not a dispute that will "affect the outcome of [this] case."

■ Ms. Dudley also alleged that BG & E had a "duty to warn her of the dangerous condition" of "its meter box, gas piping and appurtenances." Ms. Dudley claims,

[T]he defendant clearly had a continuing legal duty to warn of potential safety hazards which it became aware of after initial installation of the service pipe. *Owens–Illinois v. Zenobia,* 325 Md. 420, 446, 601 A.2d 633 (1992). There is no evidence that the defendant ever warned any occupant of the Dudley property about the propensity towards corrosion in uncoated steel pipes. . . .

In *Zenobia,* the Court of Appeals stated that "[g]enerally, a manufacturer of a defective product has a duty to warn of product defects which the manufacturer discovers after the time of sale." *Zenobia,* 325 Md. at 446, 601 A.2d 633. A manufacturer's duty to warn, however, only arises where there is a "reasonable probability of injury unless warning is given." *Katz v. Arundel–Brooks Concrete Corp.,* 220 Md. 200, 204, 151 A.2d 731 (1959).

BG & E is not the manufacturer or even the seller of Ms. Dudley's "meter box, gas piping and appurtenances;" thus, no duty to warn was generated with respect to them. Ms. Dudley seems to suggest that, because metal pipes are susceptible to corrosion, this trait alone requires BG & E to warn consumers that the pipes might leak. Ms. Dudley claims that

[t]he evidence, and the reasonable inferences which might be drawn therefrom, establishes that BG & E was aware at the time it installed the service pipes to 4300 Fairview that the pipes were subject to corrosive forces. It was further aware that over time the corrosive forces can break down the metal pipes which will result in leaking. . . . The service pipe installed at 4300 Fairview in 1951 was a steel pipe which did not contain any coating which would resist the corrosive forces. Where BG & E knows or should know that the artificial condition created by it involves an unreasonable risk of physical harm to others, then it has a duty to make safe or warn of the dangerous condition.

(internal citations to record omitted). This might be true had BG & E not taken any steps to determine if the metal pipes were corroded. But, in fact, BG & E conducted leak detection

surveys and studied leak history reports as required by federal law to determine this. Neither the surveys nor the reports indicated any corrosion or leak in the area around Ms. Dudley's home. Clearly the duty to warn cannot arise without some knowledge, actual or constructive, of the hazard that allegedly existed.

Nor do the out-of-state cases on which Ms. Dudley relies provide support for her duty to warn claim. Those cases, *Caldecott v. Long Island Lighting Co.*, 417 F.2d 994, 995 (2d Cir.1969), *Karle v. National Fuel Gas Distrib. Corp.*, 448 F.Supp. 753, 764 (W.D.Pa.1978), and *Daugherty v. Nebraska Natural Gas Co.*, 173 Neb. 30, 112 N.W.2d 790, 792–93 (1961), involve situations where a gas company had actual notice of an earlier leak or odor that indicated a leak, which preceded the later, more serious, leak that formed the basis for the lawsuit. The out-of-state cases all impute a greater duty of care once a gas company has some advance notice that a leak in a specified area has occurred. Of course, BG & E had no similar advance notice here.

■ Ms. Dudley also claims that BG & E was negligent because it failed to comply with federal regulations regarding the placement of meters in a ventilated place and in installing its underground service lines. *See* 49 CFR § 192.353 (1992) (meters "must be installed in a readily accessible location [,] ... be protected from corrosion [,] ... be located in a ventilated place and not less than 3 feet from any source of ignition or any source of heat which might damage the meter") and 49 CFR § 192.361(e)(1992) (each underground service line must "[b]e sealed in the foundation wall to prevent leakage."). BG & E did not, and does not, assert that violation of these federal regulations does not constitute negligence. That argument was not before the circuit court and is not before us. Rather, what BG & E asserts, and asserted below, is that the meter at Ms. Dudley's residence was properly installed and the service lines were properly sealed. In support of this argument, BG & E attached to its memorandum in support of summary judgment photographs of the meter assertedly showing the meter's placement in an open, ventilated space,

and of the service line, assertedly showing that it was properly sealed. Ms. Dudley claims that, "[t]hese photographs, without any amplifying testimony, fail to show as a matter of law that BG & E complied with these regulations. The trial court erred in not permitting these photographs to be considered by the trier of fact since reasonable minds could reach a different conclusion on these issues. *McLhinney v. Lansdell Corp. of Md.*, 254 Md. 7, 254 A.2d 177 (1969)."

Ms. Dudley is correct. We have carefully examined the original photographs in the record. They were not submitted under oath, or identified, let alone explained, in deposition by any BG & E witness. Nor were these photographs obtained from or vouched for by Ms. Dudley. *Compare Bond v. NIBCO, supra,* 96 Md.App. at 142, 623 A.2d 731 (summary judgment movant relied on document obtained in discovery from opposing party). Moreover, the photographs do not show by themselves the meter and the surrounding area with sufficient clarity to enable a court to determine, as a matter of law, that there was sufficient ventilation. The photographs do not by themselves clearly show to an untrained eye that the pipe was properly sealed as a matter of law. Indeed, all that the photographs show is a pipe leading into a wall. On these limited issues then, we must reverse the grant of summary judgment on the negligence count.

(ii)

Ms. Dudley next asserts that BG & E should be held strictly liable for the damage to her property, and that the lower court erred in granting summary judgment to BG & E on this claim. The Court of Appeals has held that strict liability, as defined in the Restatement (Second) of Torts § 402A (1965), can be a basis for tort recovery in Maryland. *See Phipps v. General Motors Corp.*, 278 Md. 337, 363 A.2d 955 (1976). Section 402A provides in pertinent part,

§ 402A. **Special Liability of Seller of Product for Physical Harm to User or Consumer**

(1) One who *sells* any product in a *defective condition* unreasonably dangerous to the user or consumer or to his

property is subject to liability for physical harm thereby caused to the ultimate consumer, or to his property, if

(a) the seller is engaged in the business of selling such a product, and

(b) it is expected to and does reach the user or consumer without substantial change in the condition in which it is sold.

(emphasis added.)

 In order to recover on a strict liability claim, a plaintiff must prove: "(1) the existence of a defect, (2) the attribution of the defect to a 'seller', and (3) a causal relation between the defect and the injury." *Loh v. Safeway Stores,* 47 Md.App. 110, 121, 422 A.2d 16 (1980) (citation omitted); *see also Kelley v. R.G. Industries, Inc.,* 304 Md. 124, 135, 497 A.2d 1143 (1985). In *Klein v. Sears Roebuck,* 92 Md.App. 477, 608 A.2d 1276, *cert. denied,* 328 Md. 446, 447, 614 A.2d 973 (1992), we elaborated on the necessity of proving a defect in the product:

Basically, to recover in a strict liability case, a plaintiff need not prove any specific act of negligence; he must merely prove that *the product was in a defective condition and unreasonably dangerous at the time it was sold.* The defect may be one that occurred in the manufacturing process, in which case the product does not conform to the manufacturer's own standards, or it may be a defect in design, in which case what proves to be a defect was actually intended by the manufacturer. With respect to the former, the focus is on the conduct of the manufacturer; with respect to the latter, the inquiry focuses on the product itself.

*Id.* at 484–85, 608 A.2d 1276 (emphasis added).

 Ms. Dudley alleges that the natural gas supplied by BG & E was "defective and in an unreasonably dangerous condition in that the gas was flammable and highly explosive." This claim is meritless. No defect in natural gas caused it to be "flammable and highly explosive." Flammability and explosiveness are intrinsic to the nature of natural gas. To

claim that the gas supplied by BG & E was defective and unreasonably dangerous because it is flammable and highly explosive is equivalent to asserting that a kitchen knife is defective and unreasonably dangerous because it is sharp and can cut things. This argument is really more properly articulated in Ms. Dudley's fifth count, which we discuss, *infra* § v, that BG & E should be held liable without fault because the provision of natural gas is an "inherently dangerous activity."

Ms. Dudley, however, also alleges in her strict liability count that "the gas piping" and "meter box" were "defective ... in that" that were "faulty, deteriorated and subject to leaking." She further explained:

On or about March 18, 1989, *the piping and meter box supplied by Baltimore Gas & Electric Company* began to leak natural gas into the Dudley residence in such volume as to cause an explosion demolishing the house and its contents.

* * * * * *

[BG & E] *provided to [Ms. Dudley] gas piping, a meter box* and natural gas which were defective and in an unreasonably dangerous condition in that the gas was flammable and highly explosive, *and the pipes, appurtenances and meter box were faulty, deteriorated and subject to leaking.* [Ms. Dudley] was unaware of the defective condition of *the items supplied for her use* and had no means to inspect or determine that the items were in a dangerous condition. *The items supplied for use were defective at the time they left the possession and control of [BG & E]."*

(emphasis added). Thus, Ms. Dudley, with carefully chosen words, argues that BG & E is strictly liable for defects in certain "items supplied" to her by the company.

The essential problem with this allegation is that strict liability, as articulated in § 402A, is applicable only to *sellers, i.e.,* "any person engaged in the business of *selling* products for use or consumption." Restatement (Second) of Torts § 402A cmt. f (1965) (emphasis added). BG & E is engaged in the business of selling gas to its customers; it is not in the

business of selling gas pipes or gas meters to its customers. Natural gas is the product that BG & E sells, and, it must be that product that is defective in order for strict liability to attach here. The defective condition of the "items supplied," *i.e.,* the pipes, meter, lines, etc. is not a basis for strict liability because those products were not *sold* to Ms. Dudley by BG & E. Strict liability contemplates a "sale;" thus, Ms. Dudley cannot recover on a strict liability theory of defective manufacture of these other "items."

Accordingly, Ms. Dudley's strict liability claim was properly disposed of by the grant of summary judgment.

(iii)

 Next, Ms. Dudley asserts that the circuit court erred in granting summary judgment to BG & E on her claim of breach of warranty. In her complaint, Ms. Dudley alleged that BG & E impliedly warranted the delivery of gas in a safe and effective manner so as not to damage [the plaintiff's] property." The warranty BG & E allegedly breached was an implied warranty of merchantability, provided for in the Uniform Commercial Code (U.C.C.) as adopted in Md.Code (1975, 1992 Repl.Vol.), § 2–314 of the Commercial Law Article. That statute provides, *inter alia:*

> Unless excluded or modified ... a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to *goods* of that kind.

(emphasis added).

In order to state a cause of action for breach of implied warranty, Ms. Dudley must demonstrate a defect in the product supplied—here, the natural gas—such that it was not fit for its usual purpose. *See Giant Food, Inc. v. Washington Coca–Cola Bottling Co.,* 273 Md. 592, 607–609, 332 A.2d 1 (1975). As we have explained above, it is alleged that the natural gas supplied to Ms. Dudley was defective because it was "flammable and highly explosive;" these, however, are not defects of natural gas but qualities intrinsic to non-defective natural gas. No other defect in the gas is alleged. Accord-

ingly, Ms. Dudley has not alleged a cause of action for breach of implied warranty; judgment to BG & E on this count was proper.

(iv)

In her penultimate count, Ms. Dudley alleges that she contracted with BG & E "for the provision of natural gas to her residence and paid for the services rendered on a monthly basis." She further alleges that "[i]mplicit in [her] contract [with BG & E] was the understanding and agreement that [BG & E] would supply natural gas to [her] in a safe and effective manner so as not to damage her property.... [that BG & E] breached its contract in that it delivered the gas through defective pipes, meter boxes and other appurtenances...." BG & E answered the complaint generally denying "any liability for the claims made in the complaint." Neither in its motion for summary judgment nor in the two memoranda filed in support of that motion, however, did BG & E even address this claim. Moreover, BG & E makes no argument in this Court as to why it should have been granted summary judgment on this claim. Accordingly, the factual allegations set forth in this count of complaint are totally unrebutted. The grant of summary judgment as to it was, thus, improper.

(v)

Finally, Ms. Dudley alleges that the circuit court erred in granting BG & E's motion for summary judgment on her claim that BG & E should be held liable without regard to fault because "sufficient facts were presented from which a jury could reasonably conclude that BG & E placed within its land, property and piping system highly volatile and explosive natural gas, permitted the artificial accumulation of natural gas within its property which escaped into the Dudley residence causing an explosion and destroying her home and personal property."

The liability without fault doctrine Ms. Dudley relies upon here is a form of strict liability. This claim is identical to Ms. Dudley's earlier assertion, considered in part (ii) within, that

BG & E should be held strictly liable for the damage to her property. The former claim involves an allegation that the products sold to Ms. Dudley were unreasonably dangerous because of a defect, either in the manufacture or design of the product; this final claim in contrast, states that the activity of delivering gas to consumers through a pipe distribution system is inherently dangerous, even without any defects in products, and simply cannot be performed safely. The strict liability doctrine for abnormally dangerous activities is set out in the Restatement (Second) of Torts §§ 519 and 520 (1977), which provide:

### § 519. General Principle

(1) One who carries on an abnormally dangerous activity is subject to liability for harm to the person, land or chattels of another resulting from the activity, although he has exercised the utmost care to prevent the harm.

(2) This strict liability is limited to the kind of harm, the possibility of which makes the activity abnormally dangerous.

### § 520. Abnormally Dangerous Activities

In determining whether an activity is abnormally dangerous, the following factors are to be considered:

(a) existence of a high degree of risk of some harm to the person, land or chattels of others;

(b) likelihood that the harm that results from it will be great;

(c) inability to eliminate the risk by the exercise of reasonable care;

(d) extent to which the activity is not a matter of common usage;

(e) inappropriateness of the activity to the place where it is carried on; and

(f) extent to which its value to the community is outweighed by its dangerous attributes.

There is, of course, some risk involved in distribution of gas through underground pipes and meters. It is not, however,

risk of a "high degree" because federal and state regulations concerning corrosion, testing, gas leakage and inspection keep the possibilities of incidents to a minimum. Thus, the risk can, and has been, greatly eliminated through regulation and inspection. The resultant harm from an accident might be great in certain circumstances; however, in the majority of cases, the leak is detected and corrected before any injuries occur. On the other hand, distribution of gas is entirely appropriate and its value to the community is great. BG & E provides over 550,000 people in the Baltimore area with natural gas as a source of heat and energy in their homes and businesses.

*Yommer v. McKenzie*, 255 Md. 220, 257 A.2d 138 (1969) is instructive. There, a plaintiff, who charged that a gasoline station that had installed a large underground gasoline storage tank in close proximity to his well, allowed gasoline to leak into his well and thereby damaged his property, was held to have stated a cause of action of strict liability. The Court of Appeals held that although the operation of a gas station did not involve a high degree of risk of injury to others, the placement of the tank in such close proximity to the plaintiff's well did involve such a risk. The Court went on to explain, in a footnote specifically adopting § 520, that "[a]n activity is a matter of common usage if it is customarily carried on by the great mass of mankind, or by many people in the community.... Gas and electricity in household pipes and wires [are examples of common usage], as contrasted with large gas storage tanks or high tension power lines." *Id.* at 225 n. 2, 257 A.2d 138 (quoting § 520 cmt. i). Thus, *Yommer,* suggests that the distribution and consumption of natural gas, through an underground pipe system, is a common usage. *See also, Voelker v. Delmarva Power & Light Co.,* 727 F.Supp. 991 (D.Md.1989).

Moreover, we have uncovered no case, in Maryland or any other jurisdiction, in which a natural gas utility company was held strictly liable for injuries based on the theory that the distribution of natural gas is an abnormally dangerous activity incapable of being carried out without significant risk. Many

208

cases specifically hold to the contrary. *See, e.g., Auriemme v. Bridgeport Gas Co.,* 21 Conn.Supp. 66, 144 A.2d 701 (Conn.Super.1958) (distinguishing natural gas distribution from the category of other activities, including natural gas storage that have been held inherently dangerous). *See also Zamora v. Mobil Oil Co.,* 104 Wash.2d 199, 704 P.2d 584, 587 (1985) (holding propane gas to be an inherently dangerous product); *New Meadows Holding Co. v. Washington Water Power Co.,* 102 Wash.2d 495, 687 P.2d 212, 217 (Wash.App.1984) (transmission of natural gas through underground lines is not an abnormally dangerous activity); *Hartford Fire Ins. Co. v. Public Serv. Comm'n of Colorado,* 676 P.2d 25, 27 (Colo.App. 1983) (the storage of natural gas, as opposed to its distribution, is an inherently dangerous activity); *Noack v. B.L. Watters, Inc.,* 410 So.2d 1375, 1376 (Fla.App.1982) (installation of natural gas lines is an inherently dangerous activity). Thus, the circuit court properly granted summary judgment to BG & E on Ms. Dudley's claim of liability without fault.

In summary, we reverse the grant of summary judgment on the fourth count (breach of contract), and that portion of the first count (negligence) in which Ms. Dudley alleged that BG & E was negligent in its placement of the meter in an area that was not properly ventilated and in not fitting and sealing the pipes leading into her house in accordance with pertinent federal regulations. We affirm in all other respects.

JUDGMENT AFFIRMED IN PART AND REVERSED IN PART.